20   268
132  355
20   268
144  291
20   268
151  469
152  113
20   268
161  433
20   268
170  235
20   268
176  130
20         268
e 22 SC ¹267
20       268
23 SC ⁴134
20       268
209   ¹ 61
20       268
36 SC ³652

# In the matter of Pennock's Estate.

1. Words in a will, expressive of desire, recommendation, and confidence, are not words of technical, but of common parlance, and are not *primâ facie* sufficient to convert a devise or bequest *into a trust;* and the old Roman and English rule on this subject, is not part of the common law of Pennsylvania.

2. Such words may amount to a declaration of trust, when it appears from other parts of the will that the testator intended not to commit the estate to the devisee or legatee, or the ultimate disposal of it to his kindness, justice, or discretion.

3. A testator, after directing the payment of his debts, provided as follows: will and bequeath to my wife "the use, benefit, and profits of all my real estate, during her natural life; and also all my personal estate, of every description, including ground-rents, bank-stock, bonds, notes, book-debts, goods and chattels, absolutely; having full confidence that she will leave the surplus to be divided at her decease, justly amongst my children."

It was *held*, that by the will the *absolute* ownership of the *personal* property was given to the widow, with an expression of mere expectation that she would use and dispose of it discreetly as a mother, *and that no trust was created in relation to it:* Coates' Appeal, 2 *Barr* 129 ; McKonkey's Appeal, 1 *Harris* 253, in this respect, overruled.

4. The word " surplus" in this devise construed to mean what was left of the personal estate unconsumed, or undisposed of by the widow in her lifetime, and not the balance left after the payment *of the debts of the testator.*

THIS case was brought into the Supreme Court from the Orphans' Court of *Chester county.* The argument in 1850 resulted in the opinion and decree reported in the case of McKonkey's Appeal, 1 *Harris* 256, &c. The case was sent to a master, to whose report exceptions were taken, and after argument, the opinion of the Court, hereinafter stated, was delivered by LOWRIE, J.

In February, 1824, Isaac Pennock, of Chester county, died leaving seven children, and leaving a large real estate, and personal property inventoried at above $100,000. A short time before his death he made a will, by which he disposed of all his estate, and he appointed his wife Martha, and his eldest son Isaac, executors. Isaac died in 1832, and Martha, the widow, survived him nearly twelve years, and died on 15th September, 1844.

The dispute arose upon the following clauses in the will of Isaac W. Pennock :—

In the first place, it is my will and desire that all my just debts and funeral expenses be fully paid and discharged.

Item : I will and bequeath unto my dear wife, Martha Pennock, the use, benefit, and profits of all my real estate, during her natural life; and also all my personal estate of every description, including ground-rents, bank-stock, bonds, notes, book-debts, goods and chattels, absolutely; having full confidence that she will leave the surplus, to be divided at her decease, justly amongst my children.

A subsequent clause was to the following effect :—

It is my will and desire, and I do recommend to my children to

[Pennock's Estate.]

remain in the family with their mother, with whom I have perfect confidence they will always find a comfortable home.

In the concluding clause of the codicil to the will it was stated, that he reposed full confidence in his wife that she would discharge her duty as a mother, and. that it was his will and desire that his children would manifest their dutiful subjection and attachment.

It was stated, in the report of the master, hereinafter referred to, that the value of the testator's personal property, unconsumed at the death of Mrs. Pennock, somewhat exceeded $40,000, but of which only certain shares of Delaware Bank stock, valued at $1123, was all of it which remained in the form in which it was at the death of Isaac Pennock.

The widow made a will, by which she disposed of all her real and personal estate, but without reference to the will of her husband.    In her will but three of her seven children were provided for, but most, if not all of them, had been benefited by her in some way.    David McKonkey was appointed the executor of her will.

In November, 1844, Dr. Coates, who intermarried with Martha, one of the children of the testator, petitioned the Orphans' Court of Chester county, setting forth the will of Isaac Pennock, the claims of the petitioner and his wife under it; that Martha Pennock, the surviving executor, had possessed herself of the personal estate; that no account of the administration of the same had been settled, &c.; and calling on David McKonkey, as executor of the will of Martha Pennock, to settle an account, and praying for general relief.

A citation was issued.    David McKonkey, as executor, &c., of Martha Pennock, appeared and demurred to the petition, denying the right of the petitioner to have an account; because, he alleged, that Isaac Pennock, by his will, had given the whole of his personal estate to his wife, for her own use, and that his children were not entitled to any part of it.

Upon this demurrer the Orphans' Court of Chester county decided in his favor, and sustained the demurrer.    BELL, J., the president judge, delivered an elaborate opinion, in which it was stated, as his opinion, that, under the will, the right of the wife was not limited to the disposition of the *income* of the personal estate, leaving the principal thereof intact; but that the will gave to her an *absolute* property in the personal estate bequeathed, with a discretion to give or not, as she pleased, to the children; that, as a result of this, the plaintiff had no interest in the estate, and his petition and the citation thereon were dismissed.

From the decree of the Orphans' Court there was an appeal to the Supreme Court.    The Supreme Court, after hearing and argument, reversed the decree of the Orphans' Court, and sent the case back, to be proceeded in according to their decree and directions.

z 2

[Pennock's Estate.]

The case is reported in 2 *Barr* 129, Coates' Appeal. In this case it was decided that the widow took, under the will, but a life estate in the personal property bequeathed to her, with remainder *in trust* for the children of the testator. Whether he gave her power to make a will, and to discriminate among her children according to her idea of justice, was not decided, but was reserved. The decree of the Orphans' Court sustaining the demurrer was reversed, and *procedendo* awarded.

The record having been remitted, the executor of Martha Pennock filed an answer, alleging various matters as grounds of excuse for not accounting. Among these grounds of excuse were, that the children of Isaac Pennock claimed the remainder of the Rokeby property, after the termination of her life estate, and that by reason of that claim the proceeds of the sale of that property were secured in trust for her benefit for life, and, after her decease, for her children (except George), or their representatives; that advancements had been made by Martha Pennock to all her children; that the children were estopped, &c.

The Orphans' Court, on the 29th of April, 1846, appointed an auditor "to take proofs of the facts and circumstances, and state an account, if necessary."

The auditor, after hearing the parties and evidence, made a report, exhibiting his views of the facts, and stating an account, showing a balance of $43,572.27.

To this report exceptions were filed on both sides, but by agreement in writing they were all withdrawn, and, on petition of McKonkey, the executor, auditors were appointed to make distribution.

The balance due by Martha Pennock to the estate of her husband was, by the proceedings thus far, stated to be the sum of $43,572.27.

The counsel for the executor of Martha Pennock contended, before the auditors, among other things,

1. "That Martha Pennock had a right, under her husband's will, to dispose of his personal estate by will, discriminating according to her notions of justice between her children, and that she had exercised that right. Consequently, the trust fund should be awarded to David McKonkey, the trustee."

2. That the children of M. Pennock had recognised her claim as absolute owner of the personalty, had received benefits, were estopped, &c.

3. That they had accepted devises and bequests, and could not claim adverse to the will.

4. "That such of her children as had been advanced by her in her lifetime, either directly, in money or goods, or indirectly by receiving the use of the real estate at a nominal rent, or were indebted to her for money lent, or otherwise, could not claim any-

thing but the balance of their shares of the trust fund, after deducting their debts or advancements."

The auditors distributed the funds as if Mrs. Pennock had no such power as that contended for, or had failed to exercise it; did not recognise any estoppel, and decided that the evidence of advancements having been made by Martha Pennock to her children, or of any indebtedness of them or either of them (except George) to her, was insufficient.

The auditors distributed to each of the children, except George, and to the children of Isaac W. Pennock, $6718.28.

On the report being filed, exceptions were taken by Thomas E. Crowell, assignee of George W. Pennock, who claimed a share in right of his assignor, for the benefit of his creditors; and by David McKonkey, who insisted that the auditors ought to have awarded all to him, as executor and trustee under the will of M. Pennock, or that they ought, at least, to have deducted certain advancements alleged to have been made to the children.

The Orphans' Court overruled all the exceptions, and directed the fund to be distributed to the several persons named in the report of the auditors, as therein stated, with interest from September 17, 1846.

From this decree all the parties, except Sarah T. Pennock, appealed. Dr. Coates and two others, objecting that interest ought to be allowed from the death of Martha Pennock; T. E. Crowell, that a share ought to have been awarded to him, as assignee of George Pennock; and David McKonkey, that he was entitled to the whole balance, or that there were advancements which should have been deducted from the shares of the children.

On these appeals the cause came again into the Supreme Court, where it was argued in January, 1850.

The Court decided that the will of Isaac Pennock gave to Martha Pennock the power to dispose of the personal estate bequeathed to her by will among her children, but *that the power had not been executed;* that the trust fund to be divided among the children, consisted of the personal *estate of Isaac Pennock remaining unused* or undisposed of by her at her death; that the division was to be made as in default of an execution of the power; and that any child advanced by her, in her lifetime, was to be considered satisfied to the extent of the advancement. See McKonkey's Appeal, 1 *Harris* 253.

It was also decided, that the will of Mrs. Pennock was not an execution of the power conferred by the will of her husband, and had no bearing upon the question of distribution; that the objections interposed by the executor to an equal distribution of the balance of the personal estate of Isaac Pennock, remaining in the hands of his surviving executor, were unsound, and that each child was entitled to an equal share of that balance, unless he or she

had been advanced by Mrs. Pennock; and that the advancements (if any) were to be deducted from the shares to which the children would be respectively entitled, and were thus to be accounted for in the distribution; and reference was therefore made to the master, to ascertain whether there were any advancements, the value of the surplus of the personal estate of the testator unconsumed at Mrs. Pennock's death; and the value of that part of it which was included in the will.

The executor of Mrs. Pennock submitted evidence relating to the property which remained *in specie* from the death of Isaac Pennock to that of his widow, and which consisted mainly or altogether of fifty shares of Delaware Bank stock, of the value of $1123.

On the argument before the master, the executor's counsel assumed new ground, viz., that the property decided, in Coates' Appeal, to be vested in Mrs. Pennock as a trust, and to be accounted for as such by her or her representatives, might have been used or disposed of by her without being held accountable, and that only the balance left *at her death* was for distribution.

The propriety of this position was considered by the master, and denied. His report was submitted, in which it was stated that there were no advancements except to George W. Pennock; that the value of the testator's personal property, unconsumed at Mrs. Pennock's death, was $40,309.70, of which $1123 remains *in the form in which it was at Isaac Pennock's death;* and that that part of the testator's personal property which was included in Martha Pennock's will was $6718.28.

To the report of the master a number of exceptions were taken on the part of McKonkey, the executor, *et al.*, one of which was: That he had given an erroneous construction to the cases of Coates' Appeal, 2 *Barr* 129, and McKonkey's Appeal, 1 *Harris* 253.

Some of the exceptions were in disaffirmance of the matters above mentioned as stated in the report of the master.

The case was once argued, but a re-argument was directed, which took place in January, 1853.

*P. S. Smith, H. J. Williams,* and *T. S. Bell* were for appellants.—It was contended that the decision in Coates' Appeal, 2 *Barr* 129, had been virtually overruled by the decision in McKonkey's Appeal, 1 *Harris* 253. In the former it was denied that the widow had any right to the corpus of the bequest, but that it was to be preserved undiminished; whilst, in the latter, it was ruled that she had an absolute right to dispose of any part of it, and that a *trust* existed only to the surplus undisposed of at her death. That the law as to the operation of words of recommendation, confidence, or request, attached to an absolute gift of personal

[Pennock's Estate.]

estate, has, in late times, varied from the earlier authorities. That, in recent cases, the gift has been held to be uncontrolled by the request or recommendation made or confidence expressed : 64 *Law Lib.* 262 ; 2 *Story's Eq.* 1067–69 ; 72 *Law Lib.* 348 ; 5 *Law and Eq. Rep.* 49.

The word "absolutely" was inserted, not as requisite to describe *the quantity* of interest which the widow was to take, but to indicate the actual manner in which she was permitted to use it. Reference was made to Doe *v.* Simpson, 5 *East* 172 ; 4 *Bing.* 505 ; 2 *Philips's Ch. Cases* 196 (22 *Eng. Ch.*). In the present case the words passed absolute uncontrolled property.

In the last clause of the *codicil* the testator spoke of the confidence he had reposed in his wife, but without referring to it as of binding or controlling obligation.

*J. J. Lewis* and *J. M. Read*, for appellees.—It was alleged to be unreasonable to limit the term "surplus" to what remained *unchanged* at the death of the widow, as this construction would have put it into her power, by changing the fund, to defeat the trust.

It was contended that the decision in *Coates' Appeal* was not changed by the decision in *McKonkey's Appeal,* and that it had been decided, *in the former case,* that the widow was a trustee of the whole balance of the estate, after the payment of debts, legacy, &c., for the benefit of the testator's children. That, whatever was her power to discriminate among them in the distribution, she was a trustee of the estate remaining *at his death,* to be accounted for and distributed *at her death* in certain shares among the children. The property was theirs in shares equal or unequal. That it was not intended by the decision in McKonkey's Appeal to overrule or change such decision. It was decided, *in the latter case,* that the power to discriminate existed in her, but that it was not executed, and that therefore the statute of distribution must furnish the rule for the division of the estate.

It was further contended that Chief Justice GIBSON did not intend to say that the power was applicable only to the *surplus* remaining after the widow had disposed of such part of the estate as her caprice dictated, for then the trust was *uncertain ;* and it was admitted that certainty as to the subject was one of the requisites to the existence of a trust of this nature. It was alleged that he did not design to question this settled rule of construction. It was remarked that on the argument of McKonkey's Appeal, no question was raised as to the amount of the trust fund. That it was assumed to have been definitively settled by the former decision.

It was also remarked that the questions as to the nature of the bequest were closed by the decision in Coates' Appeal, and there-

fore they were not discussed at this time, on the part of the appellees.

The opinion of the Court was delivered, January 27, 1853, by

LOWRIE, J.—This case has already been twice before this Court, and the action of the Court on those occasions is reported in Coates' Appeal, 2 *State R.* 129, and in McKonkey's Appeal, 13 *Id.* 253. In both those instances, the will of Isaac Pennock has undergone the construction of this Court, in so far as it relates to the rights here in controversy; and now, when the cause comes on for final determination, we are asked by the appellants to hear them again on their rights under that will, before the door of justice is for ever shut against them.

We have therefore heard and reheard, before a full Court, the argument which the parties have thought proper to present on the original question, partly because we could not say that the question was conclusively settled by an interlocutory order, and partly because it is impossible to deny that there is an irreconcilable discrepancy in the two opinions and orders heretofore announced in this very cause. We have given to the question a very careful consideration, and are now prepared to pronounce the judgment which is, in our opinion, demanded by the law.

For the purpose of introducing this question in its general aspect, we need to state no more than that Isaac Pennock devised to his wife Martha all his real estate for life, and all his personal estate "absolutely, having full confidence that she will leave the surplus to be divided at her decease justly among my children." The mother is now dead, and the children claim that the bequest of the personal estate was a trust for their benefit, and have filed their petition against their mother's executor for an account. The argument in support of the petition is that the words which I have quoted from the will are of a technical character, and do of themselves import a trust, and that such is here the proper construction of them, unless there are other expressions controlling them and showing a contrary intent.

Certainly the principles of equity are part of our common law. It is the very essence of common or customary law that it consists of those principles and forms which grow out of the customs and habits of the people. It is therefore involved in its very nature that only so much of the English law as is adapted to our circumstances and customs is properly recognised as part of our common law. This same principle is most emphatically involved in the cardinal maxim of all common law, *cessante ratione legis, cessat et ipsa lex.*

The technical effect insisted upon as belonging to the words already quoted, having never received a judicial sanction in this state until the first opening of this cause, and no rights having

ever been finally decided according to it, the question is still fairly open for consideration whether, under our law, these words have any such technical character. It is of course a consideration of some weight, that, besides our provincial existence with many laws and institutions peculiar to ourselves, we have existed as an independent state for three-quarters of a century without learning that such words have any technical meaning by our law, or are to be construed differently from words of common parlance.

It is unquestionable that such modes of expression were formerly used in the Roman and in the English law in order to create a trust, and it was founded on good reason; but if that reason had passed away before the settlement of this country, then the rule which depended upon it was not imported as part of the law which we brought from the mother country. That it remains of any force in England, after the reason of it has ceased, is not surprising; for it is a common fate of institutions to outlive the causes which gave rise to them, and thus very often the form survives the principle which it was designed to express.

It is acknowledged that the rule by which a trust is raised out of such words, was imported into the English from the Roman law. Its origin, therefore, in the Roman law, is a relevant subject of inquiry; for if we find it arising there, not from the ordinary meaning of the words, but under the constraint of circumstances which have no existence here, the force of the Roman rule will be much impaired, if not destroyed. If, under their law, words of common parlance acquired a technical value by reason of a peculiar institution, then that technical value depends upon circumstances and ceases with them, and the common meaning alone remains. To construe such words, after that, as technical, is, in almost all cases, to pervert the true meaning of the words, unless other parts of the instrument clearly show that they are technically used.

It was part of the Roman law that the heir or devisee accepting the estate of a decedent became at once charged with the payment of all his debts, whether the estate was sufficient to discharge them or not. Hence, and by way of compensation, he was not bound to pay any of the legacies bequeathed by the testator; but this matter was left by the law entirely to his discretion. It was of the essence of a Roman will that the devisee should be universal successor to the property and debts of the decedent. He was in form and substance what we would call executor and sole devisee and legatee, with the additional qualification that he (or they, for many might be joined) was bound personally for the debts, if he accepted the devise.

It is plain how restricted was the right of devise under such a law. When all the testator's bequests could be defeated at the pleasure of the devisee or instituted heir, he had no alternative but

to use words of confidence, recommendation, or entreaty, as to any legacies or special devises, and such words would be much more likely to be regarded than the clearest imperative words.

Moreover, there were great and peculiar difficulties in making a valid will at all under the Roman law, owing to the excessive strictness and complexity of the formalities required; and hence it was usual to add a codicil, in which the testator entreated his heir at law, if the will should not stand, to make the desired dispositions, or to hold the property for the benefit of the persons named in the codicil. Here, again, words of entreaty are much more appropriate than imperative words. Under the circumstances, they clearly proved an intention to impose a duty on the general devisee as far as was possible, and not merely to intrust him with a discretion. He intended a legacy; it was the law that made it discretionary in disregard even of imperative words.

It is very plain that such an institution is at war with moral principle, and it could not exist long without giving rise to many aggravated cases of breach of such trusts, that would call loudly on the law to interfere with the discretion of the heir or devisee, and enforce the clear intention of the testator. Hence arose an alteration of the law, and the prætors were required to enforce trusts that were created in this form. Under such circumstances the new rule was a proper one; for it enforced the very duty imposed by the testator in the best form in which he was allowed to express it. No doubt the law continued after the reason of it had ceased; but then it contravened the intention of the testator by enforcing, as a binding obligation, what had been intrusted to the discretion of the heir or devisee. These matters are fully illustrated in *Domat.* 2, 3, 1; 1 *Spence's Eq. Jurisd.* 435; and in the *Corpus Juris Civ. Inst.* 2, 20 and 25; *Dig.* 28, 1 and 29, 7, and 30, 31 and 32; *Code* 6, 23 and 36.

Very similar was the origin of such trusts in England. The power of devise existed among the Anglo-Saxons in its fullest extent, and hence we might expect to find no such trusts among them, and it is said that no Anglo-Saxon will has been found containing the appointment of an executor charged with trusts: 1 *Spence's Eq. Jur.* 23, quoting *Hinks' Dissert.* 37. But, after the Norman conquest, and under the strict principles of feuds, devises of lands were not allowed. Hence the frequent resort to conveyances in trust, in order to be able to make provision for younger children, and for other purposes. These trusts were at first of no binding obligation, but depended for their execution entirely upon the honor of the grantee, and it was therefore very natural and appropriate that words of recommendation, desire, entreaty, and confidence should be used. Dishonesty would, of course, often occasion enormous grievances arising out of breaches of such confidence. It was very easy then for an English Chancellor to bring

[*Pennock's Estate.*]

in the Roman law to correct such evils. It was really enforcing what was intended to be a trust, and changing the law to do it. It was equity stepping in to correct the deficiencies of common law institutions, and modifying them into accordance with the changing customs and circumstances of the people. The rule, thus properly introduced, has of course outlived the circumstances which gave it birth, and which alone ought to maintain it.

But the rule is fading away even in England. The disrelish with which it is received by the legal and judicial minds of that country may be seen in the doctrine of extreme certainty required as to the subject and object of the recommendation: Wright *v.* Atkins, 1 *Ves. & B.* 313; *Turner & Russell* 157; Ex parte Payne, 2 *Younge & Col.* 646; Tibbett's *v.* Tibbetts, *Id.* 664; Harlan *v.* Trigg, 1 *Bro. C. C.* 142; and in the fact that it is degraded into the class of implied or constructive, and not express trusts: *Lewin on Trusts* 66; *Jeremy* 99; 2 *Rop. on Leg.* 380, &c.; 2 *Story Eq.* s. 1074; 1 *Atk.* 619: and that it is everywhere regarded as frustrating the will of the testator: 1 *Simons R.* 540, 551; 1 *Ves. & B.* 315; 2 *Story Eq.* ss. 1069–74.

Such words are not now regarded in England as creating a trust, unless, on the whole, they ought to be construed as imperative: 2 *Spence Eq. Jur.* 65; 1 *Bro. P. C.* 481; 2 *Ves. Jr.* 632. And the rule is treated as a mere artificial one, that is to be strictly limited to the demands of authority. It looks upon the words as *primâ facie* words of trust: 7 *Sim.* 665; 2 *Ves. Jr.* 335, 533; yet any words or expressions are eagerly seized hold of as indications of a contrary intent: 1 *Sim.* 550, 552; 15 *Id.* 33, 300; 3 *Beav.* 172; 5 *Cl. & Finn.* 147, 153; 1 *Bro. C. C.* 143; 2 *My. & K.* 144.

Where it is apparent that the kindness or justice or discretion of the devisee is relied on, no trust arises: 9 *Sim.* 319; 10 *Id.* 1; 5 *Mad.* 434; 3 *Beav.* 154, 172, 176; 2 *You. & Col. N. S.* 582, 590; 2 *Ves. Jr.* 530, 533. And if it can be implied from the words that a discretion is left to withdraw any part of the subject of the devise from the object of the wish or request, or to apply it to the use of the devisee, no trust is created: 2 *My. & K.* 201; 10 *Sim.* 5; 3 *Beav.* 173–4; 1 *Bro. C. C.* 179; 2 *Id.* 585; 3 *Ves. Jr.* 7; 5 *Madd.* 121; 1 *Sim. & S.* 389; 6 *Beav.* 342; 2 *Cox* 354. See also 2 *Spence Eq. Jur.* 65 et seq.

Now it is very plain that, on the former hearing of this cause, Chief Justice GIBSON regarded Mrs. Pennock as having the right to withdraw the principal as well as the interest for her own use as the absolute owner. He says, 13 *State R.* 258, "it is plain that she was to use, not only the income of the personal estate, but the estate itself, as if she were the untrammelled owner of it. What other meaning can be given to the word 'absolutely?' We may not strike it out, and if he meant not to give her a right

to consume both principal and proceeds he knew not what he said."
And the order of reference to ascertain "the value of the surplus
of the testator's personal property unconsumed at Mrs. Pennock's
death," was a consequence of that opinion. But it was not a
legitimate consequence, as the cases last above referred to prove;
for if she might apply the principal to her own use, then there
can be no trust, and the case ought to have been dismissed, not
referred. How could there be a trust in the legal sense of that
word? No trust or contract that is uncertain is enforced by law;
because the law would have to define it, or, in other words, create
it, before enforcing it.

If this is a trust, it was so in the mother's lifetime, and could
have been enforced as such. But how compel her to hold for the
benefit of her children that over which she had the absolute con-
trol, and which she could spend as she pleased? If she could
thus use it she was no trustee in the eye of the law, and her repre-
sentative cannot be so treated after her death.

In fact, she did act all her lifetime as if she were the absolute
owner, and did convert almost the whole of the property to her
own use without any one of her children complaining of any breach
of trust. And it is not now the surplus in fact that they are
seeking to recover; but they are claiming from her executor an
account of their property converted by their mother to her own
use.

It cannot be denied that there is considerable discrepancy in
the English decisions on this subject, and nothing less can reason-
ably be expected. An artificial rule like the one insisted on here,
that is founded on no great principle of policy, and that sets aside,
while it is professing to seek the will of the testator, must continu-
ally be contested and must be frequently invaded. And no one
can read the English decisions on this subject without suspecting
that all important wills, wherein similar words are found, become
the subjects of most expensive contests, and give rise to those
family quarrels which are the worst and most bitter and distressing
of all sorts of litigation. We may well desire that such a rule
shall never constitute a part of our law. It rejects the plain com-
mon sense of expressions, and it is not in human nature to submit
to it without a contest.

Let us examine this will without the aid of this antiquated rule.
Isaac Pennock says: "I will and bequeath unto my dear wife,
Martha Pennock, the use, benefit, and profits of all my real estate
during her natural life, and also all my personal estate of every
description, including ground-rents, bank stock, bonds, notes, book-
debts, goods and chattels, absolutely, having full confidence that
she will leave the surplus to be divided at her decease justly among
my children."

Now it is plain, that, if the words of confidence were left out,

[Pennock's Estate.]

Mrs. Pennock would have taken the personal estate absolutely. What did he intend by those words of confidence? Evidently to commit all the personal property to the discretion of his wife. He expected her to use it as she pleased, and to leave what should remain at her death "justly" among his children; but he enjoined nothing. His will was to give her the power of disposal, because he had confidence in her. He intended no interference with or guidance of her discretion; but trusted all to a mother's heart. Yet this is the intention which the law is expected to guide. And, in order to enforce this demand, it is insisted that she had but a life estate in the personal property. But the testator excludes this construction, for he places the real estate "for life" in contrast with the personal estate "absolutely;" and contrasted expressions cannot be equivalent. And yet, without forcing this construction, this case is at an end, unless it be insisted that the mother took no estate at all for herself; which is too absurd to be thought of. And as to the word "surplus," it can have no other meaning than the one above given, and that given by Chief Justice GIBSON in the opinion before referred to. The view here taken of the words of confidence is further confirmed by other parts of the will, where he, with "perfect confidence" and "full confidence," intrusts his children to the kindness of their mother. Here, surely, he was intending no legal trust.

If the will of the testator was to give to his wife the property, to be disposed of at her discretion, it is not for the Court to say that she has exercised that discretion badly; and it is impossible to say wherein, under a change of circumstances, he would have exercised it differently.

We may now add, that we know of no American case wherein the antiquated English rule has been adopted, and that, as it is now regarded even in England, this case would not now be governed by it: 1 *Bro. C. C.* 179; 2 *Id.* 285; 5 *Madd.* 118; 6 *Beav.* 542; 2 *Younge & Col.* 590; 2 *Cox* 354; 3 *Ves., jr.,* 7; 15 *Sim.* 33; 1 *Id.* 542; 5 *Eng. L. & Eq. R.* 49. See also 2 *State R.* 131, and herein we agree with the learned judge of the Court below.

It is not to be disputed, that these views are directly opposite to those expressed by this Court when this cause was first heard; but we cannot help it. We are bound to decide this cause upon our present views of the law. And such changes of opinion in the progress of a cause are not at all uncommon, owing to the increase of information or the change of judicial functionaries, or both. The case of Lawless v. Show, 5 *Clark & Fin.* 129, is an illustration of this, and it belongs to the class of cases we have been discussing. One Lord Chancellor declared it a case of trust, and a new Chancellor granted a rehearing and declared the reverse, and his decree was affirmed in the House of Lords. Even in the

present case, the opinion first declared adopted the old English rule in all its stringency, while the second one obviously flinches from a full application of a construction so artificial and unnatural. Such vacillations are to be expected, where an unusual rule comes to be first applied. It is well to declare at once, and before any wrong is consummated by our judgment, that the rule has no foundation in any of our customs or institutions, and no place in our law.

Our conclusions are,

1. Words in a will expressive of desire, recommendation, and confidence are not words of technical, but of common parlance, and are not, *primâ facie*, sufficient to convert a devise or bequest into a trust; and the old Roman and English rule on this subject is not part of the common law of Pennsylvania.

2. Such words may amount to a declaration of trust, when it appears from other parts of the will that the testator intended not to commit the estate to the devisee or legatee, or the ultimate disposal of it to his kindness, justice, or discretion.

3. By this will, the absolute ownership of the personal property of Mr. Pennock is given to his widow, with an expression of mere expectation that she will use and dispose of it discreetly as a mother, and that no trust is created thereby.

DECREE.—January 27, 1853. This cause came on to be heard on an appeal from the decree of the Orphans' Court of Chester county, and was argued by counsel, and thereupon, on consideration thereof, it is ordered, adjudged, and decreed, that all the orders and decrees made in the said Orphans' Court, and in this Court, since the appeal from the first decree of the said Orphans' Court, sustaining the demurrer of the respondents and dismissing the bill or petition of the complainants, be vacated and set aside, and that the said first decree of the said Orphans' Court be affirmed, and that the parties do severally pay their own costs.