## Tuttle's Estate.

Argued April 12, 1938.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and RHODES, JJ.

*P. V. Gifford,* with him *Walter J. McClintock,* for appellant.

*Elmer L. Evans,* with him *Clarence T. Bryan,* for appellee.

OPINION BY PARKER, J., July 15, 1938:

Roxie Tuttle died November 21, 1935, after having

made a last will and testament wherein she appointed Harry W. Parker her executor and bequeathed her estate, after the payment of funeral expenses and debts, to her granddaughter, Charlotte Tuttle Braendel. Decedent's entire estate consisted of $3,158.25 on deposit in her name in the Citizens National Bank, of Corry, Pennsylvania. Several years before her death, Mrs. Tuttle placed $3,000 in the hands of Harry W. Parker, cashier of that bank, asking him to take care of the money for her. Mr. Parker deposited the money in a certificate of deposit in her name in that bank, and from time to time she drew part of the interest which accumulated so that at the time of her death the fund had increased to $3,158.25.

At the final audit the only claims presented were for administration and funeral expenses aggregating $630, and a claim by Meadville Children's Aid Society and Home for the Aged in the amount of $2,341, the claim being for the maintenance and support of the decedent in the home maintained by that organization for a period from July 3, 1927, to November 2, 1935. Mrs. Braendel, although sole legatee under the will of Roxie Tuttle, took the position at the audit that the fund in the hands of the executor was not the absolute property of Roxie Tuttle but represented a trust fund created by Amos Tuttle, son of Roxie Tuttle, for the benefit of his mother, his daughter, Mrs. Braendel, and a minor son of the daughter.

The court below held that the fund of $3,000 was a trust fund but nevertheless deducted from it administration expenses and funeral expenses and directed the balance to be paid directly to Mrs. Braendel and her son, Billy Braendel, in equal shares. At the same time that court failed to pass upon the validity of the claim of the "Home" or determine the amount, if any, due from the decedent for her care and maintenance therein for more than eight years.

We are all of the opinion that the evidence was not sufficient to establish a trust and that the case must therefore be returned for further action by the orphans' court. Other questions have been raised by the appellant and we will consider these in addition to the main contention.

(1) Appellant contends that the orphans' court did not have jurisdiction to determine whether the fund in question was a part of the estate of decedent or was part of a trust inter vivos created by Amos Tuttle. The cases will not support the position of appellant. At the death of Roxie Tuttle the fund was on deposit in bank in her name and when her will was probated her executor took possession of the money and included the balance in the inventory and appraisement of assets. Such being the case, the fund was presumptively hers and "a mere denial of his [her] ownership unsupported will not oust the court of its jurisdiction, but the court may proceed with its investigation so far as to inform itself, whether the denial is made in good faith and a substantial dispute exists": *Williams' Estate,* 236 Pa. 259, 270, 84 A. 848. If there had been a substantial dispute it would have been the duty of the orphans' court to direct an issue to common pleas. The facts, however, were not in dispute and it therefore remains to determine whether the facts proven established as a matter of law a trust inter vivos.

(2) We will refer to the evidence produced in support of the claim that Amos Tuttle created a trust inter vivos for the benefit of his mother, daughter, and grandson in a light most favorable to them and assume, for the sake of argument only, that Mrs. Braendel was a competent witness to establish the trust and its alleged terms. Amos Tuttle, prior to his death, had contributed to the support of his mother, Roxie Tuttle, and was carrying a life insurance policy on his life in her favor. After his death on August 8, 1923, the proceeds of the

policy, amounting to $3,000, were paid to Roxie Tuttle. Some time prior to her death she placed $3,000 in the hands of the cashier of the Citizens National Bank, of Corry, Pennsylvania, and requested him to take care of the money for her. The cashier deposited that sum in a certificate of deposit in her name, as we have heretofore stated. When the money was handed over to Mr. Parker, she made no statement as to the source from which it had come.

To establish a trust Mrs. Braendel depended upon testimony as to conversations between Amos Tuttle and his mother, Roxie Tuttle, with reference to the insurance policy to which we have referred. Mrs. Braendel, over the objection of counsel for the "Home" and subject to an exception, was permitted to testify that Amos Tuttle was ill for four or five years prior to his death, with pernicious anemia, and that during this time he had given his mother twenty dollars a month for her support. At that time she owned her home in Corry. During his illness Mrs. Tuttle called to see her son in Erie a number of times. Mrs. Braendel testified particularly with relation to an interview with him at his home in Erie in June, 1923, as follows: "He told my grandmother that he was leaving her life insurance and she had this home and he said, 'I'd like to have you use this insurance and the money you have wisely' and he said, 'What is left I'd like to have to go to Charlotte and Billy.' Q. And what if anything did your grandmother reply to him? A. Said, 'Amos, you know that I will do as you want me to do.' Q. Will you state whether or not this conversation took place between them in your presence once or twice or oftener than that? A. Oh, innumerable times especially in the last eight or nine months that he lived. By the Court: Was Billy a son? A. He is my son." Again, on cross-examination she testified: "Well, all I know is that he said, 'I am leaving you this insurance money' and he said,

'You have this home' and said, 'If you use what you have wisely I am sure that there will be something left for Charlotte and Billy' because he had a lot of expense with his health and all. He didn't have so much left and he was worried about myself and Billy because I had not anything at all and he thought the world of my son and he wanted him to have that to be taken care of. Q. What this amounted to was this, that he was simply advising her to take care of her money and use it carefully, wasn't that what it came to? A. Well, he told her that he wanted her to use this money wisely and what was left wanted to go to Billy and I and that was all." She also testified that nothing was said about the appointment of a trustee and that she understood that if Mrs. Tuttle wished to do so she could use all of the money.

The widow of Amos Tuttle testified as follows: "Q. What did he say to his mother, Roxie Tuttle, with regard to insurance? A. Well, he said he was leaving her insurance money and he wanted her to use it wisely and what was left he wanted to go to Charlotte, he said, to see that Billy was educated. Q. And what did Roxie Tuttle in response to his statement of that type say in reply, if you recollect? A. Her answer always was, 'Amos, you know I will do as you wish.' Q. Now, I will ask you whether such conversations took place just at one or two times or on various occasions? A. Every time they were together."

Mrs. Louise Bailey, a friend of the family who had been acquainted with them for more than thirty years, testified with relation to a conversation which she heard between Amos Tuttle and his mother in the year 1923 as follows: "That very day, that was on a Sunday afternoon they brought her and Mr. Tuttle was able to be up around as yet and he sat down in the kitchen and he said before us all, 'I want to talk things over with you' and he said, 'I am leaving mother'—really directed

the conversation to me—says, 'I am leaving mother some insurance' and he said, 'I know she will use what she needs wisely and the rest is to go to Charlotte and Billy.' "

The court below correctly held that a trust as to personalty may be created by parol (*Washington's Estate*, 220 Pa. 204, 205, 69 A. 747), but it is equally well settled that to establish a resulting trust the evidence must be clear, explicit, and unequivocal: *Robinson v. Powell*, 210 Pa. 232, 59 A. 1078; *McGinity v. McGinity*, 63 Pa. 38, 42; *Nixon's Appeal*, 63 Pa. 279, 282; *Kistler's Appeal*, 73 Pa. 393, 399; *Rocks v. Sheppard*, 302 Pa. 46, 50, 152 A. 754.

Giving to the language used by Amos Tuttle and his mother a construction favorable to Mrs. Braendel and her son, the words employed manifest nothing more than the expression of the fact that it would be pleasing to him if the money should be first used wisely for her own benefit and that then if there was anything left after the mother's needs were supplied, he would like to have the balance go to his daughter and grandson. Amos Tuttle disposed of the proceeds of this insurance policy by making an absolute gift to his mother in writing without conditions. He had made similar provisions for his widow and his daughter in other policies. The writing was an unconditional gift. Under such circumstances the facts lend less support to a conclusion that a trust was intended to be created, or was created, than those situations where a testator has made an absolute gift and later in the same writing expresses a wish with reference to how the legatee shall hold the gift. It has been held again and again that while an expression of a wish may amount to a testamentary disposition, if such wish expresses the intention of the testator, yet mere precatory words following an absolute disposition of the property will not operate to diminish the absolute estate previously given:

*Pennock's Estate,* 20 Pa. 268; *Burt v. Herron,* 66 Pa. 400; *Bowlby v. Thunder,* 105 Pa. 173. "After an unqualified devise by the testator of his property, no precatory words to his devisee can defeat the estate previously granted": *Hopkins v. Glunt,* 111 Pa. 287, 290, 2 A. 183. Also, see *Miller v. Stubbs,* 244 Pa. 482, 90 A. 1132; *Chew v. Chew,* 266 Pa. 526, 109 A. 799. "Words of recommendation and other words precatory in their nature in a will imply a discretion, as contradistinguished from peremptory orders, and therefore ought to be so construed, unless a different sense is irresistibly forced upon them by the context": *Lindsay's Estate,* 311 Pa. 536, 539, 166 A. 848.

Not only were the words and alleged declarations not a part of the writing, the insurance policy, but they were alleged to have been uttered long afterward and the testimony detailing the conversation was likewise given much later. Such testimony is to be "regarded with serious misgivings": 65 C. J., p. 494. Again, the testimony indicates that Roxie Tuttle was to consume as much of the principal as she needed. "If it can be implied from the words that a discretion is left to withdraw any part of the subject of the devise from the object of the wish or request, or to apply it to the use of the devisee, no trust is created": *Pennock's Estate,* supra (p. 277). Among the many expressions that have been held to be precatory the phrase here used, "I'd like to have," is among the weakest, and such words give no indication that they are intended as a positive direction: 28 R. C. L., p. 243. We are of the opinion that conversations as detailed by appellee's witnesses did not establish a trust but amounted to mere advice given by a son to his mother for whom he was making a provision in a situation where the natural objects of his bounty and of her bounty were the same persons.

The court below relied upon *Lidstone's Estate,* 92 Pa. Superior Ct. 553, and the appellant very largely

on *Hoffner's Estate,* 161 Pa. 331, 29 A. 33. In each of these cases the testimony indicated clearly that if it had not been for a positive covenant on the part of the legatee to apply a specific sum to a specific purpose, a change would have been made in the will. This is in direct contrast to the situation here presented where there is not any evidence, or any evidence from which an inference may be drawn, to the effect that any change would have been made in the gift if the mother did not do any particular thing.

As we have heretofore said, we have considered the evidence as if the testimony of Mrs. Braendel were competent since there was evidence of other witnesses to the same facts. However, on this subject see *Campbell v. Brown,* 183 Pa. 112, 118, 38 A. 516; *Roberts v. Washington Trust Co.,* 313 Pa. 584, 590, 170 A. 291; *King v. Lemmer,* 315 Pa. 254, 173 A. 176; *Honan v. Donaldson,* 331 Pa. 388, 200 A. 30.

It is necessary to return the case to the court below in order that the fund in question may be distributed in accordance with the will and that it be determined what, if any, creditors are entitled to be first paid. No disposition was made of the claim by the "Home." Important questions have been raised in connection therewith and to the end that there be a just determination of the rights of all creditors the case should be opened and the parties permitted, if they so desire, to offer further evidence bearing upon the right of the "Home" to recover and the amount, if any, to which it is entitled.

The decree of the court below is reversed and the record is remitted for further proceedings not inconsistent with this opinion.