Michael **MELLOTT**, by his father and next friend, James K. Mellott

v.

**SULLIVAN FORD SALES.**

Supreme Judicial Court of Maine.

Dec. 14, 1967.

Paine & Cohen, by Errol K. Paine, Bangor, for plaintiff.

Rudman, Rudman & Carter, by Paul L. Rudman, and Kenneth C. Roy, Bangor, for defendant.

Before WILLIAMSON, C. J., and WEBBER, TAPLEY, MARDEN, DUFRESNE, and WEATHERBEE, JJ.

WEATHERBEE, Justice.

On appeal. In an action in the District Court of District Three the plaintiff complains that while he was a minor of the age of nineteen years he purchased a truck from the defendant for which he paid the defendant $1,750.00 and that the truck was not a necessary. The plaintiff further complains that about two months later he elected to disaffirm the contract of purchase and returned the truck to the defendant demanding the return of the $1,750.00 which he had paid the defendant and that such demand was refused by the defendant. The defendant requested under M.R.C.P. 36(a) that the plaintiff admit that he is and was at the time of the purchase a married person and upon the plaintiff's failure to answer this request—thus establishing the fact—the defendant, pursuant to M.R.C.P. 56, moved for a summary judgment in its favor on the ground that there was no genuine issue as to any material fact. Upon the plaintiff's petition the matter was removed to the Superior Court of Penobscot County where the defendant's request for summary judgment was granted and the plaintiff's complaint dismissed by a Justice of the Superior Court. The plaintiff's appeal presents the issue of whether a married male minor may disaffirm on the ground of infancy a contract of purchase for property which is not a necessary and obtain the return of the purchase money.

The defendant's position is that 19 M.R. S.A. § 161 sufficiently removes the common law disability of a married male minor thereby enabling him to make a contract for purchase which is binding upon him. Section 161 reads as follows:

"A married person, widow or widower of any age may own in his or her own right real and personal estate acquired by descent, gift or purchase; and may manage, sell, mortgage, convey and devise the same by will without the joinder or assent of husband or wife; but such conveyance without the joinder or assent of the husband or wife shall not bar his or her right and interest by descent in the estate so conveyed. Real estate directly conveyed to a wife by her husband cannot be conveyed by her without the joinder of her husband, except real estate conveyed to her as security or in payment of a bona fide debt actually due to her from her husband. When payment was made for property conveyed to her from

the property of her husband or it was conveyed by him to her without a valuable consideration, it may be taken as the property of her husband to pay his debts contracted before such purchase."

The interpretation of this statute, as it applies to a married male minor, requires an examination of the history of the statutory enactments having to do with the removal of common law disabilities. The common law sought to protect the minor from the making of improvident contracts during his infancy by permitting him to rescind or disaffirm such contracts unless the articles sold to him were necessaries—the term necessaries meaning "those things useful, suitable, and necessary for the minor's support, use, and comfort, * * * limited in its inclusion to articles of personal use necessary for the support of the body and improvement of the mind of the infant * * *." Utterstrom v. Myron D. Kidder, Inc., 124 Me. 10, 12, 124 A. 725 (1924). Persons engaged in selling to a minor did so at the risk that the sale might be disaffirmed by the minor unless that person could prove that the articles furnished to the minor were in the class of necessaries. Whitman v. Allen, 123 Me. 1, 121 A. 160, 36 A.L.R. 776 (1923); Spaulding v. New England Furniture Co., 154 Me. 330, 147 A. 2d 916 (1959); Utterstrom v. Myron D. Kidder, Inc., supra.

In 1845, the Legislature enacted into law P.L.1845, Chap. 166, which restated the common law status of minors in this field and added the principle of ratification in writing. Chapter 166, which follows, has remained substantially in this form to this time.

"No action that may be brought after the passage of this act, shall be maintained against any person upon a contract made while a minor, unless the same is ratified in writing, signed by the party to be charged by said contract, after arriving at the age of twenty-one years, or by some person thereto by him lawfully authorized; provided that this act shall not apply to, or affect any contract made by a minor for necessaries, or to contracts for real estate of which a minor has received and retained the title."

Such was the state of the law in Maine until the middle of the nineteenth century when the first change in the minor's contractual status came as the result of developments in the rights of married women.

In the eyes of the common law upon marriage a husband and wife became one person and that person was the husband. A married woman of any age was held incapable of entering into binding contractual relations and of acquiring or disposing of property. Upon marriage her husband took over all her personal property and the use of her real estate for his life and became responsible for her support, her debts and her torts. The courts of equity first recognized the need of a wife to have a separate estate in some instances and later a series of legislative actions beginning in 1821 extended the wife's powers. The purpose was to more fully insure the maintenance of the married woman and the availability of her property for that purpose, if necessary. Haggett v. Hurley, 91 Me. 542, 40 A. 561, 41 L.R.A. 362 (1898); Uhl v. Oakdale Auto Co., 157 Me. 263, 170 A.2d 914 (1963).

P.L.1821, Chap. 57, § 9 empowered the courts to authorize the wife to make contracts and sue in her own name during the time in which she was abandoned by her husband. R.S.1841, Chap. 87, § 29 extended this power to the wife whose husband was in the state prison.

In 1844 the Legislature for the first time permitted all married women to own and hold property in their own names by enacting Chap. 117, § 1, which read:

"Any married woman may become seized or possessed of any property, real or personal, by direct bequest, demise, gift, purchase or distribution, in her own name, and as of her own property; provided, it shall be made to appear by such married woman, in any issue touching the

validity of her title, that the same does not in any way come from the husband after coverture."

Our court was called upon to interpret this statute in the case of Howe v. Wildes, 34 Me. 566 (1852). This case is the first of a series of decisions of this court in which the statutory relaxation of the common law disabilities of married women and minors was rigidly construed by the court under the common law rule that statutes in derogation of the common law must have strict construction. There, a married woman tenant had given promissory notes in payment for real estate which she was buying. The demandants contended that the notes of a married woman were void and that therefore they were entitled to possession of the property. The tenant argued that since P.L.1844, Chap. 117, § 1 authorized married women to become seized and possessed of real estate by *purchase,* it necessarily by implication authorized such women to enter into contract to *buy* such property, contending that the word "purchase" was intended to refer to property which had been *bought.* The court noted that the statute, being in derogation of the common law, could not be extended by implication beyond its express provision and rejected the tenant's contention and found the notes to be void and no consideration for the alleged sale. The court held that the Legislature had used the word "purchase" in its common law technical meaning which signified the acquisition of property in one of six ways—by deed, devise, execution, prescription, possession or occupancy, or by escheat—and not with the intention of extending the married woman's powers to include contracting to *buy* property.

The word "purchase" has continued in this section of the statute to this date, and neither the Legislature nor the courts have extended the limitation on the meaning placed there by *Howe.*

The Legislature again altered the status of a married woman in 1852 when it enacted a law giving the married woman the right to dispose of property which had been acquired in the manner enumerated in P.L. 1844, Chap. 117, i. e. "by direct bequest, demise, gift, purchase or distribution * * *." P.L.1852, Chap. 227, § 1, reads as follows:

"Sec. 1. Any married woman who is or may be seized and possessed of property, real or personal, as provided for in the acts to which this is additional *shall have power to lease, sell, convey and dispose of the same,* and to execute all papers necessary thereto in her own name, as if she were unmarried, and no action shall be maintained by the husband of any such married woman for the possession or value of any property held or disposed of her by her in manner aforesaid." (Emphasis added.)

This section was the first to give a married woman the power to *dispose of* property which the 1844 law had authorized her to hold. It should be noticed that while the Legislature was removing some of the disabilities of coverture, it did not, specifically at least, remove the disability of infancy which still may have attached to the situation of a married female minor, but some two months later the same Legislature used clear and unambiguous language in giving married female minors the same status as to property that their married adult sisters had been given.

P.L.1852, Chap. 291, § 3, provides:

"Any married woman under the age of twenty-one years shall have, and may exercise, all the rights, privileges and powers enumerated in the several acts now in force, securing to married women their *rights in property* in the same manner and with the same effect, as though she were of full age." (Emphasis added.)

It seems clear that the Legislature had concluded that the common law disabilities of coverture were as burdensome to the married female minor as they were to her married adult sister and that if she owned property she might have equal need to dispose of it for her maintenance and that of her children.

Since the married female minor's situation was considered in conjunction with that of a married female adult, she had at this point received an authority to lease, sell, convey and dispose of her property which had not been given to a married male minor.

In 1857 the Legislature in its revision of statutes combined Chapters 227 and 291 into R.S.1857, Chap. 61, § 1, which read:

"A married woman, *of any age,* may own in her own right, real and personal estate acquired by descent, gift, or purchase; and may manage, sell, convey, and devise * * *." (Emphasis added.)

This court in Duren v. Getchell, 55 Me. 241, 248 (1867), in discussing the construction of this statute concluded, although in dicta, that the addition of the word "manage" did not give a married woman power to contract generally but only in relation to managing her property.

In 1866 the Legislature gave the married woman the broadest of contractual powers. P.L.1866, Chap. 52, reads:

"The contracts of any married woman, made for any lawful purpose, shall be valid and binding, and may be enforced in the same manner as if she were sole; * * *."

In 1890 our court was required to construe this statute in Cummings v. Everett, 82 Me. 260, 19 A. 456 (1890), a case involving the validity of a promissory note signed by a married female minor defendant. Again, the court declined to extend abrogation of the common law beyond the clear and positive language of the statute and concluded that while the statute removed the disability of coverture, its language was not clear and direct enough to show the intent to remove the disability of infancy as well. The court pointed out that the words "married woman" could include women who until the passage of the statute might be under several disabilities—the disability of coverture, the disability of infancy and the disability of being *non compos mentis.* The

court mentioned this to make clear its finding that the law did not intend to remove *every* disability that "any married woman" might have and felt constrained to hold that the only disability removed by this statute was the disability of coverture and held that "any married woman" meant any married woman of *lawful age.* Thus in 1890 the court refused to interpret this statute so as to make a married female minor liable on all her contracts as a married female adult thereby came to be.

The question of the married female minor's rights was next considered by our court in Fields v. Mitchell, 112 Me. 368, 92 A. 293 (1914), where the court held that a married female minor could not rescind her contract to *sell* real estate. The court discussed the *Cummings* decision of twenty-four years earlier and remarked that the 1890 court had apparently overlooked the second 1852 statute (P.L.1852, Chap. 291, § 3) which gave married female minors the same rights in their property that the statutes then in force gave to the married female adult. The court suggested in dicta that if the court in *Cummings* had considered this second statute it might have held the minor defendant liable on her promissory note. The *Fields* court went on to add in dicta that " * * * the opinion in that case must be modified so far as is necessary to be consistent with the principle here announced."

This language is perplexing in as much as the principle announced in *Fields*—that is, that a married female minor could not rescind for infancy her contract to *sell* real estate—in no way made necessary the modification of the *Cummings* decision. The clear and direct language of P.L.1852, Chap. 227, § 1, gave the married female adult the right to *sell* her property and P.L. 1852, Chap. 291, § 3, extended this power to the married female minor. But the latter statute did not, as *Fields* suggests in dicta, remove *all* the disabilities of a married female minor. It gave her only such rights in property as a married adult woman had been given at that time by the statutes *then*

*in force*—which was the right to *hold* property and *manage, sell, convey and dispose of it*. No power had been given to a married adult woman to make a binding contract to *buy* property at that time. Such power was given her later, by P.L.1866, Chap. 52, which made *all* her contracts binding but the holding in *Cummings* that the married female minor was not included in the language of that statute has never been overruled.

At this point in the development of the legislative and judicial process of enlarging the powers of married minors—that is, in 1914—we find that the married female minor could hold property in her own name and could make binding contracts in managing and selling it but the married male minor could not make any binding contract except for necessaries. The clear and direct language of R.S.1857, Chap. 61, § 1, had given her greater power and responsibilities as to property than he possessed, but it had not removed *all* of her disabilities and she still could not make a binding contract to *buy* property.

The status of male and female minors remained unchanged by either statutory amendment or judicial interpretation until 1951 when the language of R.S.1857, Chap. 61, § 1, was changed by amending the words "A married *woman* of any age may own in her own right real and personal estate acquired by descent, gift or purchase; and may manage, sell, convey and devise the same by will * * *" to read "A married *person*, widow or widower, of any age, may own in his or her own right real and personal estate acquired by descent, gift or purchase; and may manage, sell, convey and devise the same by will * * *." P.L. 1951, Chap. 375, § 2. (Emphasis added)

Our problem is the construction of Section 2 which is now 19 M.R.S.A. § 161. Did the Legislature by this amendment intend to remove the common law right of a married male minor to rescind a contract to *purchase* property during his infancy or during a reasonable time thereafter?

The contractual powers of the married male minor have been considered by this court twice since the passage of P.L.1951, Chap. 375, § 2. In 1959 in Spaulding v. New England Furniture Co., 154 Me. 330, 147 A.2d 916 (1959), the plaintiff, a married male minor, sought to disaffirm his executory contract to purchase certain articles of furniture. The defendant did not contend that P.L.1951, Chap. 375, § 2 affected the married male minor's ability to disaffirm his contract to buy personal property, and the only issue before the court was the acceptance of the report of the referee which found that the particular articles in question were not necessaries. However, if, as the defendant contends here, P.L.1951, Chap. 375, § 2 gave the married male minor the power to make a binding contract to purchase, this issue would have been moot.

In 1961, in Uhl v. Oakdale Auto Co., supra, the plaintiff, a married male minor, bought an Oldsmobile automobile from the defendant, turning in a Ford as part of the purchase price. The Oldsmobile was later repossessed and the plaintiff sought to rescind the agreement and to recover the Ford which he had sold to the defendant. The court agreed with the defendant that P. L.1951, Chap. 375, § 2 (now 19 M.R.S.A. § 161) removed from the married male minor the common law right to disaffirm a *sale* of property in an action brought by him. The court in *Uhl* cautioned against too broad an interpretation of its decision, saying:

"R.S.1954, Chap. 166, Sec. 35, was in derogation of the common law and must be strictly construed. The legislation did not purport to remove *all* disabilities of a married male under twenty-one years of age. We are concerned solely with the question of whether or not the plaintiff, in view of this legislation, can, on the ground of infancy, legally disaffirm the sale of personal property made by him to the defendant."

The language describing the powers given by P.L.1951, Chap. 375, § 2 is essentially the same as was used in P.L.1852,

Chap. 227, § 1—that is, the right to own property and to dispose of it. *Howe* held that this gave married females no power to *buy* property and this conclusion stands unchanged by either statute or judicial decision. This right to *own* property and to *dispose* of it, as her married adult sister could do, was all that was given to the married female minor by P.L.1852, Chap. 291, § 3. (We are considering *her* rights here only to help us understand the legislative intent as to the statute now in issue. However, in view of the construction which *Cummings* gave to P.L.1866, Chap. 52, now 19 M.R.S.A. § 164, which construction the Legislature has not seen fit to change, we do not understand that any other statute has given her any more extensive contractual powers than these.) When the words "married woman" were changed to "married person" in 1951, the married male minor acquired the same power that the married female minor had earlier received in the same statute—which was only the right to *own* property and to *manage, sell, mortgage, convey* and *devise* it.

While P.L.1951, Chap. 375, § 2 took from the married male minor his common law power to rescind contracts to *sell* his property, there is a complete absence of clear and direct language in the statute indicating any intention to empower him to make binding contracts to *purchase* property. While it may seem incongruous that a married minor may make a binding contract to *sell* property but not to *buy* it, we know that the Legislature is still aware of the wisdom of protecting minors from improvident agreements that may result from immaturity and inexperience. P.L.1845, Chap. 166, has never been repealed and now, as 33 M.R.S.A. § 52, it still prohibits actions against a minor on his contracts (with some exceptions in relation to education) unless he ratifies them in writing after he reaches twenty-one. The Legislature, while still unwilling to permit him to bind himself with possibly unwise agreements to *buy* property, apparently realized that he may have acquired property in a manner other than by contract and that he should be able to sell or mortgage it if the maintenance of his family requires it.

■ We feel that when social and economic changes require a further relaxation of common law limitations upon the contractual responsibility of minors, any modification of such a basic principle must come from the clearly expressed intentions of the Legislature.

■ We hold that the statute does not remove the common law right of a married male minor to rescind the purchase of property, except for necessaries, on the grounds of infancy.

The entry will be: Appeal sustained.

DUFRESNE, Justice (dissenting).

Michael Mellott in February, 1966 bought and received from the corporate defendant a truck for which he paid cash the sum of seventeen hundred fifty ($1750) dollars. On or about April 8, 1966, he elected to disaffirm the purchase, returned the truck to the defendant's place of business and demanded the return of the purchase money. His demand was refused, necessitating his bringing suit through his father and next friend for the recovery of his outlay. In the posture of the case at the time of the filing by the defendant of its motion for summary judgment, the pleadings reveal that Michael Mellott, the plaintiff, was under twenty-one years of age and married when he purchased the truck and when he attempted to disaffirm. A Superior Court Justice ruled that the purchase contract was binding upon the married plaintiff, notwithstanding his minority, granted the defendant's motion for summary judgment and dismissed the complaint.

The appeal brings before us the single issue whether a married male under twenty-one years of age may legally disaffirm a purchase of non-necessary personal property on the ground of infancy. We answer in the negative.

The resolution of the issue depends upon the legal scope of 19 M.R.S.A. § 161, which reads as follows:

"A married person, widow or widower of any age may own in his or her own right real and personal estate acquired by descent, gift or purchase; and may manage, sell, mortgage, convey and devise the same by will without the joinder or assent of husband or wife; but such conveyance without the joinder or assent of the husband or wife shall not bar his or her right and interest by descent in the estate so conveyed. Real estate directly conveyed to a wife by her husband cannot be conveyed by her without the joinder of her husband, except real estate conveyed to her as security or in payment of a bona fide debt actually due to her from her husband. When payment was made for property conveyed to her from the property of her husband or it was conveyed by him to her without a valuable consideration, it may be taken as the property of her husband to pay his debts contracted before such purchase."

The parties must concede that by the use of the words 'a married person, widow or widower of any age' the Legislature brought within the reach of the statute all married people, whether adults or minors, including the surviving spouse of a marriage dissolved by death. The statute omits however persons whose marital bonds have been dissolved by divorce prior to their twenty-first birthday; such divorced persons may see their status revert to that of infants, though they may have children, upon the consideration of their property or contract rights under 19 M.R.S.A. §§ 161 and 164 or their rights to make a will under 18 M.R.S.A. § 1, but we intimate no opinion thereon. The dispute lies rather in regards to the intended legislative encompassment in the use of the underscored terms: a married person, widow or widower of any age *may own* in his or her own right real and *personal estate acquired by* descent, gift or *purchase.*

Furthermore, the rights of married persons under 19 M.R.S.A. §§ 161 and 164 must be interpreted in the light of the legislative enactments concerning contracts of persons under the age of twenty-one as spelled out in 33 M.R.S.A. § 52, which in pertinent part reads as follows:

"No action shall be maintained on any contract made by a minor, unless he, or some person lawfully authorized, ratified it in writing after he arrived at the age of 21 years, except for necessaries or real estate of which he has received the title and retains the benefit."

This provision of the statute of frauds requiring ratification in writing at majority in the case of contracts of persons of non-age was first enacted in equivalent language in 1845 by Public Laws, 1845, Chapter 166, and has continued side by side ever since with the provisions of 19 M.R.S.A. §§ 161 and 164 as this legislation concerning the rights of married persons was developed in the course of the years.

The plaintiff contends that the rights of the married male minor are co-extensive with the rights of the minor married woman. He claims however that the rights in property of married women when under twenty-one years of age have not been extended by the Legislature to reach their contracts to buy property, even though he concedes that full rights have been granted them concerning their contracts to sell property. His argument seems to run along these lines. The original statute conferring rights in property to married women was enacted in 1844. Chapter 117, § 1, originally read as follows:

"Any married woman may become seized or possessed of any property, real or personal, by direct bequest, demise, gift, purchase or distribution, in her own name, and as of her own property; provided, it shall be made to appear by such married woman, in any issue touching the validity of her title, that the same does not in any way come from the husband after coverture."

In 1848, by Public Laws, Chapter 73, § 3, the Legislature extended the rights of married women to include the right to dispose of her property by will:

"When any married woman shall die intestate, seized or possessed of any property, real or personal, in her own name, exempt from the debts or contracts of her husband, the same shall descend or be distributed to her heirs; but any married woman may, by will duly executed, devise and bequeath any property of which she is, or may be hereafter so seized or possessed."

In 1852, by Public Laws, Chapter 227, the Legislature added to the rights of married women to acquire property and dispose of it by will, further rights of disposition as follows:

"Any married woman who is or may be seized and possessed of property, real or personal, as provided for in the acts to which this is additional shall have power to lease, sell, convey and dispose of the same, and to execute all papers necessary thereto in her own name as if she were unmarried, and no action shall be maintained by the husband of any such married woman for the possession or value of any property held or disposed of by her in manner aforesaid."

In the same Legislature of 1852, at Chapter 291, § 3, the acts securing to married women their rights in property were extended to married women under twenty-one years of age:

"Any married woman under the age of twenty-one years shall have, and may exercise, all the rights, privileges and powers enumerated in the several acts now in force, securing to married women their rights in property in the same manner, and with the same effect, as though she were of full age."

These several legislative provisions were consolidated in the Revised Statutes of Maine, 1857, and were incorporated in Chapter 61 of said revision entitled "RIGHTS OF MARRIED WOMEN," as follows:

"Sec. 1. A married woman, *of any age, may own* in her own right, real and personal estate *acquired by* descent, gift, or *purchase; and may manage, sell, convey, and devise the same by will, as if sole*, and without the joinder or assent of her husband; but real estate directly or indirectly conveyed to her by her husband, or paid for by him, or given or devised to her by his relatives, cannot be conveyed by her without the joinder of her husband in such conveyance. When payment was made for property conveyed to her from the property of her husband, or it was conveyed by him to her without a valuable consideration paid therefor, it may be taken as the property of her husband to pay his debts contracted before such *purchase*." (Emphasis supplied)

Included in the 1857 revision were the provisions of the Revised Statutes of 1841 respecting married women's limited rights to contract with court approval:

"Sec. 7. When a husband abandons his wife and leaves the state, without making sufficient provision for her maintenance, or is confined in the state prison in execution of a sentence, the supreme judicial court, on her application, may authorize his wife, during such absence or confinement, to make contracts under seal or otherwise, and any person holding personal property to which he is entitled in her right, to pay or deliver the same to her, for her disposal, and for which she may make a valid discharge. Such application may be presented in any county and notice thereof given, as in case of a libel for divorce, before such powers are granted.

Sec. 8. All contracts, lawfully made by her by virtue of such power, are binding upon her and her husband, and during such absence or confinement, she may sue and be sued thereon, and for all acts done by her; and execution may be enforced

against her, as if unmarried. No such suit is abated by the return or release of the husband, but he may, on application, be admitted to prosecute or defend jointly with her.

Sec. 10. When a married woman comes from any other state or country, and remains in this state, without living with her husband, she may make contracts, dispose of property, sue and be sued, as if unmarried. When her husband comes and claims his marital rights, her contracts and suits shall be affected the same as if they were then first married."

Then in 1866, the Legislature by Chapter 52 of the Public Laws of that year, granted to married women the power to contract generally as it declared their contracts made for any lawful purpose valid and binding, to wit:

"The contracts of any married woman, made for any lawful purpose, shall be valid and binding, and may be enforced in the same manner as if she were sole; and her separate property shall be holden by attachment, or levy on execution, in any suit brought to enforce such contract, but she shall not be liable to arrest, on any writ in such suit, or on any execution issued on a judgment recovered in the same; provided that nothing in this act shall be so construed so as to affect any suit now pending."

This 1866 enactment became section 4 of chapter 61 of the 1871 Revised Statutes, being inserted in the chapter which enumerated the rights of married women and read as follows:

"Sec. 4. A husband married since April twenty-six, eighteen hundred and fifty-two, is not liable for the debts of his wife contracted before marriage, *nor for those contracted after, in her own name, for any lawful purpose*; but she is liable in both cases; a suit may be maintained against her, or against her and her husband therefor; and her property may

be attached and taken on execution for such debts as if she was sole; but she cannot be arrested." (Emphasis supplied)

This provision was inserted in all subsequent revisions without any substantial change and is now 19 M.R.S.A. § 164.

The plaintiff argues that in Howe v. Wildes, 1852, 34 Me. 566, this Court construed the rights of married women under the 1844 statute which authorized married women to "become seized and possessed of any property, real or personal, by purchase" and in so doing declared that a married woman under that statute did not have the power to buy real estate on credit. The case stands for the rule that even after the 1852 statute granting married women the right to acquire real or personal property by purchase, a conveyance of land, made to a married woman in consideration of her promissory note for the purchase money, is without valid consideration and therefore void. The plaintiff says that since the rights of married persons, male or female, of any age including those under 21 years of age, under 19 M.R.S.A. § 161, in the area of ownership of real and personal estate are limited to such rights as are acquired "by descent, gift or purchase," the same terminology as used in the 1844 statute, then, so he says, the ruling *in Howe* is controlling and the plaintiff's purchase of a truck from the defendant is not binding, even though the contract was executed and not executory, on the grounds that the plaintiff minor, notwithstanding his status of a married person, had no power to make a binding contract except subject to the provisions of 33 M.R.S.A. § 52. The plaintiff however cannot claim as *in Howe* that the contract of purchase of a truck by a minor married person, male or female, is void; at the most plaintiff contends that such contract is voidable, is not binding on the minor and may be disaffirmed.

In 1951, the Legislature intended to grant the married male the same rights concerning the acquisition and disposition of prop-

erty, real or personal, as existed in favor of the married female. Initially, let us take cognizance of the fact that the married male never was subjected to the disabilities of coverture that prevailed at common law for the protection of married women; the unity concept of marriage at common law viewed the spouses as one person, but with the advantage given to the male who was considered that person. Thus at common law, the husband, if of age, in contrast to the wife, had full rights to contract, to acquire property and make disposition thereof and to make a will in regards to the same. Not so with the married woman. Her rights were enlarged piecemeal by the Legislature, undoubtedly as her needs for greater privileges than the common law recognized became manifest. Without any comprehensive plan of equality of the sexes until 1951, it is little wonder that the married woman who was the continued object of legislative bounty for years became possessed of more rights than the married man had to such a degree of imbalance that the Legislature in 1951 felt compelled to bring the male partner in marriage up to par. Indeed, the married male person or widower was granted rights to make a will while under 21 years of age only in 1951, while the under-age married female was given such rights in 1852 as indicated above, (see also, R.S.1857, c. 61 § 1) and the infant widow obtained the same in 1917. (See, Public Laws, 1917, c. 17). The same is true concerning the respective rights of infant spouses, male or female, in disposing of property other than by will, except that in such instance the infant widow was granted such rights in 1951 at the same time as the infant widower.

I do not disagree with the holding *in Howe*, that "[T]here does not appear to have been any language used in the Act, with a design to remove the disabilities imposed by the common law upon a feme covert, and to enable her, contrary to its rules, to make sales and purchases of property;" that part of the Act concerning the rights of married women had been construed to that effect a short time before in the case of Swift v. Luce, 1847, 27 Me. 285. At the time of *Howe*, the rules of the common law were supreme. As pointed out therein, a married woman had, in general, no power or capacity to contract so as to sue or be sued either with, or without her husband, on her contracts made during coverture. She had in legal contemplation no separate existence, her husband and herself being in contemplation of law one person. In fact, her rights to contract were very limited. On application to the supreme judicial court, a married woman, whose husband had absented himself from the state and abandoned her without sufficient provision for her maintenance, could be granted the power, during his absence and until his return, to make and execute in her own name any contract under seal or otherwise, and could be authorized to make sale of any estate, real or personal, of which she was seized or possessed in her own right. Similar powers could be granted by the court in favor of the married woman who had established herself in Maine without the joinder of her husband or whose husband had been sentenced to confinement in the state prison. Such contracts were binding on both the wife and husband. See, Revised Statutes, 1841, c. 87, §§ 22, 23, 27, 29, 30, 32, and 33. None would contend however that the married woman under twenty-one years of age in the absence of her husband under the circumstances enumerated above could not secure from the court the same authority to contract under Public Laws, 1852, c. 291, § 3. The *Howe* court in the presence of such limited statutory rights to contract running in favor of married women could not logically find in the legislative act of 1844, c. 117, § 1, securing to married women their rights to become seized or possessed of property by purchase, any intent on the part of the Legislature to grant to married women full rights to contract generally.

Such was not the situation however after the passage of the 1866 Act. As we have

seen, P.L.1852, c. 291 § 3, provided that any married woman under the age of twenty-one years shall have, and may exercise, *all* the rights, privileges and powers enumerated in the several acts now in force, securing to married women their rights in property *in the same manner, and with the same effect, as though she were of full age*. This legislation was tantamount to an emancipation declaration in favor of all married women under the age of twenty-one years who thereafter would have the same rights and powers of married women generally, notwithstanding their minority. The limitation of the statute to "all the rights, privileges and powers enumerated in the several acts now in force" merely served to indicate that the rights of married women generally were not being extended beyond what they were at the time of passage of the Act. Nevertheless, the legislative intention is clearly manifest that from 1852 the term "any married woman" as used in the chapter securing to married women their rights in property would mean any married woman of any age, minor or adult. That such was the manifest legislative intent is reinforced by the fact that the 1866 Act, chapter 52, which made the contracts of *any* married woman for any lawful purpose valid and binding was passed, so its title indicates, as an integrated part of chapter 61 of the revised statutes and laws additional thereto.

"All statutes on one subject are to be viewed as one and such a construction should be made as will as nearly as possible make all the statutes dealing with the one subject consistent and harmonious." Inhabitants of Town of Turner v. City of Lewiston, 1938, 135 Me. 430, at page 433, 198 A. 734, at page 735. In the reference case, this Court under the above stated rule of construction read into the Act enacted as P.L.1935, c. 91, providing for reimbursement for school conveyance expenditures as a *pauper supply*, the necessity of giving the pauper notice under R.S.1930,

c. 33, although the Act of 1935 was silent thereon.

In the instant case, when the Legislature granted full rights to married women relative to contracts made by them for any lawful purpose, it must be presumed to have passed such legislation in the light of the law which then existed and which had emancipated the married woman under the age of twenty-one years from the disability of non-age. To ascribe to the phrase 'the contracts of *any* married woman' the broad meaning and interpretation of a married woman of any age gives to the statute a rational and reasonable interpretation, conformable to the manifest intent of the Legislature to extend the rights of all married women generally in the field of contracts, provided that such contracts be made for a lawful purpose. No reason appears why a minor married woman, who in 1866 could make a will (P.L.1848, c. 73), lease, sell, convey and dispose of property real or personal (P.L.1852, c. 227), notwithstanding her nonage (P.L.1852, c. 291), would be excluded from the broad sweep of the 1866 statute. To the contrary, the Act should be construed in the light of the Legislature's previous enlargement of rights in favor of married women of any age.

We are not unmindful of Cummings v. Everett, 1890, 82 Me. 260, 19 A. 456, wherein our Court concluded "that the legislature has not yet expressed or implied an intention that a married woman, under the age of 21 years, shall be held liable on her executory contracts." In *Cummings*, the issue was whether a minor married woman was liable on her promissory note. The reasoning in *Cummings* is not persuasive in the least and we must as was done in Fields v. Mitchell, 1914, 112 Me. 368, 92 A. 293, eliminate the same from any authoritative position. Indeed, it is apparent as pointed out in *Fields* that the *Cummings* Court was unaware of Public Laws 1852, Chapter 291, which removed the disability of infancy for married women. *Fields* held that the sale of real estate by a female married infant is not

voidable on the ground of infancy and that since 1852 all married women in this State have possessed the same rights regarding the sale of their property whether under twenty-one years of age or over.

In Uhl v. Oakdale Auto Co., 1961, 157 Me. 263, 170 A.2d 914, our Court was concerned with the question of whether or not the married male plaintiff under the age of twenty-one years, in view of R.S.1954, c. 166, § 35 (now 19 M.R.S.A. § 161), can, on the ground of infancy, legally disaffirm the sale of personal property (the trade-in Ford automobile) made by him in his purchase from the defendant of an Oldsmobile automobile. In *Uhl*, our Court held that the statute of frauds legislation requiring ratification in writing of contracts by minors after they reach their majority was modified by R.S.1954, c. 166, § 35 (now 19 M.R.S.A. § 161) and that the married male minor plaintiff was bound by his contract of sale of the Ford automobile and could not disaffirm the sale solely on the ground of infancy.

It is true that in the instant case we are concerned with the purchase of a truck by a male married minor and not with the sale thereof. But the purchase of property is placed by the statute on the same level as the sale thereof. 19 M.R.S.A. § 161 reads

"A married person, widow or widower of any age may own in his or her own right real and personal estate acquired by * * * *purchase*; and may manage, *sell*, mortgage, convey and devise the same by will * * *."

We have hereinbefore stated that the 1866 Act, which granted to married women the right to contract generally, by reason of its integration into the State's comprehensive plan of full rights to married women, was intended to include married women under the age of twenty-one years. As such there would be no question of the right of all married women to acquire property by purchase and incidentally to contract for the purchase of property. But even if we would deny such intent on the part of the Legislature in 1866, on account of some so-called strong policy contrariwise under the common law, we cannot ascribe to the Legislature such restrictive intendment when it enacted 19 M.R.S.A. § 161 in 1951 (P.L.1951, c. 375). It is manifest that the Legislature intended to give identical rights to married males as married females enjoyed, whether they were over or under the age of twenty-one years, to the extent of permitting these rights to remain during widowhood or widowerhood. It is clear that the Legislature had in mind full rights respecting property, from the right to acquire property to the right to dispose of the same, even to the extent of duplication for purposes of clarity. Indeed, the right to dispose of property by will was included in both, section 1 and section 2 of the Act. Similarly, a married woman's contract rights are provided both in § 161 and in § 164 of 19 M.R.S.A. The amendment of 1951 was not a mere consolidation, but it served to grant full and equal rights to married persons of both sexes, whether they were over or under the age of twenty-one years, whether or not their spouse was living or dead. At the time of the passage of the Act of 1951 there was no common law policy of coverture; rather the legislative policy could be said to be for full and equal rights for married women, with the possible exception of the right to enter into a partnership agreement with her husband. See, Haggett v. Hurley, 1898, 91 Me. 542, 40 A. 561. The time had come to provide for equality to the married male.

The fundamental rule of construction of statutory provisions is that language shall be interpreted in accordance with the intention with which it was used, if that result may be accomplished by giving words their ordinary and usual significance, their common and popular sense. 1 M.R.S.A. § 72 (3); In re Opinion of the Justices, 1947, 142 Me. 409, 60 A.2d 903; Depositors Trust Company of Augusta v. Johnson, 1966, Me., 222 A.2d 49.

Legislative intention shall be given effect if determinable from the language used, accepting the words in their ordinary signifi-

cation. State of Maine v. Harnum, 1947, 143 Me. 133, 56 A.2d 449.

Indeed, legislative intent once determined controls. The intention of the law maker is the law. Steele v. Smalley, 1945, 141 Me. 355, at page 359, 44 A.2d 213. It is the duty of the court to interpret the language of a statute so as to carry out the obvious purpose which the legislature had in mind. Emple Knitting Mills, Aplt. v. City of Bangor, 1959, 155 Me. 270, 153 A.2d 118.

In Inhabitants of the City of Lewiston v. Inhabitants of the County of Androscoggin, 1956, 151 Me. 457, 121 A.2d 471, our Court sanctioned again the following quotation from Sweeney v. Dahl, 1943, 140 Me. 133, 34 A.2d 673, 151 A.L.R. 356:

"The Legislative intent in a statute must primarily be ascertained from the language thereof and not from conjecture. In other words, the Court will first seek to find the Legislative intention from words, phrases and sentences which make up the subject matter of the statute. If the meaning of the language is plain the Court will look no further; it is interpreted to mean exactly what is says."

The legislative purpose and intent, if discernible from the statutory language, must prevail irrespective of any rule of interpretation calling for strict construction. Acheson et al. v. Johnson, 1952, 147 Me. 275 at page 281, 86 A.2d 628.

It is only when the purpose is not clearly expressed that we have the right to use the usual outside aids or rules of construction to determine it. This court has frowned on the practice of attempting to interpret what needs no interpretation. Gilman v. Jack, 1952, 148 Me. 171, 91 A.2d 207; Millett v. Marston, 62 Me. 477.

Rules of construction when applied to statutes are nothing but judicial formulas indicating presumptively what the legislative intent is when the facts encompassed by the rule are present. They are merely aids to construction and are not conclusive there-

on. They must yield when the intent is clear or the natural and obvious meaning of the statutory language forecloses further interpretation or when other considerations repel the presumptive intent carried by the rule. Clark v. Maine Shore Line Railroad Co., 1889, 81 Me. 477, at pages 481–482, 17 A. 497; Coffin v. Rich, 1858, 45 Me. 507, 511.

To construe the statute to mean as contended by the plaintiff that the married minor, male or female, is bound by a sale but not by the purchase of personal property, would ascribe to the Legislature the intendment of inconsistent and incongruous results, and knowingly to seek unjust, impractical and absurd consequences. We do recognize that the *Howe* court in 1852 reached its conclusion by construing the statutory term "purchase" according to its technical meaning in law and not according to its usual and ordinary sense of an act of buying as opposed to an act of sale or selling. In the face of the absurd results which such ancient interpretation would bring about, the rule of construction which imputes to the Legislature the adoption of judicial construction of words of a statute must yield to the rule of construction that withholds from the Legislature any purpose to intend unjust, impractical or absurd consequences, especially in the instant case where a construction in accordance with the plain and ordinary meaning of the word "purchase" would obviate such illogical conclusions.

"The results of any particular construction are to be anticipated, and if such results will be anomalous, unjust, or even inconvenient, it is a legitimate and strong argument against the construction contended for. It will be presumed the legislature did not intend any such results. The language of a statute would need to be very strong and clear to cause a belief that such was the intent." Landers v. Smith, 1886, 78 Me. 212, 3 A. 463. See also Carrigan v. Stillwell, 1905, 99 Me. 434, 59 A. 683, 68 L.R.A. 386; Perkins v. Kavanaugh et al., 1938, 135 Me. 344, 346, 196 A. 645; Inhabitants of Town of Ashland v. Wright, 1943, 139 Me. 283, 29

A.2d 747; Emple Knitting Mills, Aplt. v. City of Bangor, 1959, 155 Me. 270, 153 A.2d 118.

Following the reasoning expressed in Gilman v. Jack, 1952, 148 Me. 171 at page 175, 91 A.2d 207, 209, we must say that the instant statute is worded in clear and precise terms; its meaning is evident to all and if carried out according to its common sense and understanding, the statute so interpreted will not lead to any absurd conclusion. No solid reason appears for refusing to admit the meaning which the word 'purchase' naturally imports. To impute to twentieth century legislators the same thinking as may have been prevalent in the preceding century in the construction of the instant 1951 statute is to go outside the act in search of conjectures for the mere sake of limiting the broad sweep of the statute obviously intended by the framers thereof.

In the instant case, we are dealing with a cash sale so-called, to wit, an executed purchase by the plaintiff from the defendant. But we should not interpret this statute in a vacuum. We must consider the probable consequences which the interpretation contended for by the plaintiff may be anticipated to bring about. In the *Uhl* case, our Court held that the plaintiff, a minor married man, could not disaffirm his sale to the garage defendant of the Ford trade-in automobile solely on the ground of infancy. The Court did not have to concern itself, and did not, with the plaintiff's rights respecting the Oldsmobile purchased by him in the trade of his Ford. But if a minor married man is bound by the sale of his trade-in automobile, and not bound by the purchase of the other car in the deal, then we have the impractical and absurd result that the same person may disaffirm one half of a contract while being bound by the other half. As appears in Levine v. Reynolds, 1947, 143 Me. 15, 54 A.2d 514, whether a contract is severable or entire depends upon the intention of the parties thereto. Purchases of automobiles wherein trade-in vehicles are involved as part of the purchase

price are daily occurrences and usually constitute one single entire contract which the parties would not have entered into absent the trade-in portion of the agreement. Rescission of a single entire contract of purchase must be made in toto; it cannot be affirmed in part and disaffirmed in part. The purchase and sale must stand or fall together. It does not make sense that in a completed cash purchase of an automobile involving a trade-in vehicle, the married male purchaser under twenty-one years of age may disaffirm the purchase and recover only part of the consideration, (the sale of the trade-in being binding on him) while the single man under age in disaffirming could recover both the balance of the purchase price and the value of the trade-in vehicle.

Paraphrasing the language of Peaks v. Hutchinson, 1902, 96 Me. 530, 53 A. 38, 59 L.R.A. 279, we may add: "Our enabling statutes during the last sixty years were obviously intended to confer upon a married woman [whether adult or under age] important rights and powers not previously enjoyed, and it is not the province or the duty of the court to nullify these statutes and defeat the obvious purpose of them by excluding from the operation of their general terms each particular contract that may arise, on the ground that it is not within the intendment of any of the acts."

The Legislature's attempt to free the married man and widower from the disabilities of infancy and emancipate him into adulthood in recognition of the obligations imposed upon him should not be thwarted by the courts, under the guise of carrying on a legislative policy long discarded.

Rules of construction should be disregarded when they serve to foil manifest legislative intent. I cannot accept the rationalization advanced as a justification for such statutory mutilation as this Court now undertakes. Let us not legislate by indirection. With due respect, I must dissent. I would deny the appeal.