MARGO CUSTER ET AL. *v*. NICHOLAS BONADIES, REGISTRAR OF VOTERS FOR THE CITY OF HARTFORD, ET AL.

SUPERIOR COURT          HARTFORD COUNTY          FILE No. 178366

Memorandum filed January 29, 1974

*Judith Mears,* of New Haven, for the plaintiffs.

*Richard M. Cosgrove,* assistant corporation counsel, for the named defendant.

*Edmund J. Eshenfelder,* of New London, for the defendants Callahan et al.

STAPLETON, J.  This is an action of mandamus by two married women to compel their local registrars of voters to permit them to register to vote in their maiden names.  In the first count the plaintiff Margo Custer alleges that although she was married in 1970 she has never assumed the surname of her husband but has continued without interruption to use her birth name, Margo Custer, in her professional and personal affairs.  She further alleges that she has met all of the statutory qualifications for electors of the city of Hartford and the state of Connecticut, but that the defendant registrar of voters of Hartford refused to accept her application for registration in her own name and conditioned her right to register and vote upon her use of her husband's surname—a name which she had never used and did not plan to use in the future.  She

argues that such a condition upon her right to vote is neither required nor permitted by Connecticut law and that it singles out married women for discriminatory treatment in violation of their fourteenth amendment rights to equal protection of the laws.

In the second count the plaintiff Jane Holdsworth makes essentially the same allegations against the registrars of voters of the city of New London. She also alleges that the New London registrars refused to permit her to register to vote in her own, i.e. maiden, name in reliance upon an opinion of the attorney general, Robert Killian, that a married woman could register only in her husband's surname.

The case was tried to the court. There was no serious dispute as to the facts, and the court finds them essentially as alleged in the complaint. A number of legal issues are presented. They may be briefly summarized as follows: (1) Upon marriage, is a woman required to assume her husband's surname as a matter of law? (2) Does Connecticut law preclude a married woman from registering to vote under her maiden name, even though she has consistently used it as her own before and since her marriage? (3) If so, does such a limitation upon the right to vote constitute an invidious discrimination against women in violation of their fourteenth amendment rights to equal protection of the laws? (4) Is mandamus an appropriate remedy in this case?

I

It is a well-established principle of common law that a person is free to adopt and use any name that he or she sees fit if it is not done for any fraudulent purpose and does not infringe upon the rights of others. 57 Am. Jur. 2d, Name, §§ 1, 10. Connecticut

has adopted this rule, which operates independently of any court order and even though there is a statutory procedure for effecting a change of name. *Don* v. *Don,* 142 Conn. 309, 312. In some of the treatises it is also stated to be a common-law principle and "immemorial custom" that upon marriage a woman, ipso facto, abandons her maiden name and assumes her husband's surname. 57 Am. Jur. 2d, Name, § 9. There are a number of cases which support this proposition, many of them dating back to before the turn of the century. See, for example, *Bacon* v. *Boston Elevated Ry. Co.,* 256 Mass. 30, 32 (1926); *Kelle* v. *Crab Orchard Rural Fire Protection District,* 164 Neb. 593, 598 (1957); *Chapman* v. *Phoenix National Bank,* 85 N.Y. 437, 450 (1881); *Freeman* v. *Hawkins,* 77 Tex. 498, 500 (1890).

It is claimed by the plaintiffs that this practice is the result of social custom and that there is no legal compulsion on a married woman to adopt her husband's name. This claim would appear to be true under the common law of England and Canada. 12 Halsbury, Laws of England (3d Ed.) p. 410; W. K. Power, The Law and Practice Relating to Divorce and Other Matrimonial Causes in Canada (2d Ed.) pp. 357–58; *Re Dalgleish Estate,* [1956] 18 W.W.R. (n.s.) 519, [1956] 4 D.L.R.2d 111. The rule is thus stated in 19 Halsbury's Laws of England (3d Ed.), p. 829: "When a woman on her marriage assumes, as she usually does in England, the surname of her husband in substitution for her father's name, it may be said that she acquires a new name by repute. The change of name is in fact, rather than in law, a consequence of the marriage."

This approach, that a woman voluntarily adopts her husband's surname by social custom but is under no legal compulsion to do so, is also supported by some of the more recent American cases. *Stuart* v.

*Board of Supervisors of Elections,* 266 Md. 440 (1972); *State ex rel. Krupa* v. *Green,* 114 Ohio App. 497 (1961).

This issue is one of first impression insofar as our Connecticut courts are concerned.

It has been generally stated that while Connecticut has not formally adopted English common law, it has been made our own by "practical adoption," unless modified by legislation, and with such exceptions as diversity of circumstances and customs requires. *Bassett* v. *City Bank & Trust Co.,* 115 Conn. 393, 398.

There is nothing in the English common-law rule unsuited to the customs and conditions of American society—particularly at this time in our history. The rule that requires a woman to assume her husband's surname upon marriage made some sense in an age where a married woman could not contract, hold property or sue or be sued except through her husband. "[H]usband and wife are one, [and] the one is the husband." *United States* v. *Yazell,* 382 U.S. 341, 361 (dissenting opinion). But such restrictions on the legal rights of married women do not exist today in Connecticut.[1] We live in the age of the women's rights movement, when federal law prohibits discrimination in employment on account of sex,[2] when the equal rights amendment has passed the Congress (March 22, 1972) and the Connecticut legislature (March 15, 1973), when women march in the streets to demand equal status before the law, and when some women go to court for the right to

---

[1] For example, General Statutes § 46-9 expressly recognizes the rights of married women to retain their separate earnings, to make contracts, to receive and convey real and personal property, and to sue and be sued among other things; and § 46-10 makes them responsible for their own purchases.

[2] Civil Rights Act of 1964 § 703 (a) (1), 78 Stat. 255, 42 U.S.C. § 2000e-2 (a) (1) (1970).

vote in their "own" names. It hardly seems the time for the Connecticut courts to accept an outdated rule of common law requiring married women to adopt their spouse's surnames contrary to our English common-law heritage and to engraft that rule as an exception to the recognized right of a person to assume any name that he or she wishes to use.

It is doubtless true that the vast majority of women will continue to follow the social custom of our times and adopt their husbands' surnames. That fact, however, provides no basis for a rule of law which would mandate it despite personal, professional or business reasons which would motivate individual women to do otherwise. Some hear a different drummer and step to the music which they hear, however measured or far away. There is nothing in the common law of Connecticut which forbids it. The court therefore concludes that the common-law right of a person to the use of a name, a right enunciated by our Supreme Court in *Don* v. *Don,* 142 Conn. 309, applies to the surname of a married woman.

## II

### A

The defendants claim that the legislature has changed this rule and adopted the principle, at least by implication, that upon marriage a woman assumes her husband's surname as a matter of law. In support of this contention the defendants cite two sections of the General Statutes:

"Sec. 47-13. Conveyance by married woman of property acquired before marriage. Any married woman who conveys property acquired prior to her marriage shall state in the instrument of conveyance the name under which she acquired such property, and the town clerk shall index the record of such

instrument in the name under which such property was acquired and in the name under which it was transferred."

"Sec. 46-21. Alimony and change of name. The superior court may assign to any woman divorced by such court a part of the estate of her husband and, in addition thereto or in lieu thereof, may order alimony to be paid from the husband's income, *may change her name* and may order alimony pendente lite to be paid to the wife in any complaint or cross-bill for divorce pending in said court. . . . [italics supplied]."[3]

The defendants claim that the clear implication of these statutes is that a woman's name automatically changes upon marriage. Otherwise, they argue, there would be no need for the italicized provision authorizing a change of name for a woman after divorce, and this would be counter to the presumption that the General Assembly had a purpose for every sentence, clause or phrase in a statute. *State v. Springer,* 149 Conn. 244, 248. These arguments, however, fail to recognize the distinction here between a generally prevailing social custom and a mandate of law. No one denies that the overwhelming percentage of women assume their husbands' surnames upon marriage. The legislature recognized this and took it into account in legislation dealing with the indexing of the land records and in authorizing a change of name in a divorce decree. There is nothing in these statutes, however, which transforms a recognized social custom into a rule of law.

---

[3] Effective October 1, 1973, § 46-21, among other sections, was repealed by § 43, the new Dissolution of Marriage Act (Public Acts 1973, No. 73-373), but § 14 of that act contains a comparable provision authorizing a change of name for the former wife. The differences in language in the new law would not appear to mandate any different result in the instant case.

## B

The first sentence of § 9-20 of the General Statutes, dealing with the admission of electors, provides that each person who applies for admission shall "state under oath his name, residence, birthplace, date of birth, whether he is a United States citizen, how long he has continuously resided in the town in which he so applies, whether his privileges as an elector are forfeited by reason of conviction of crime, whether he has previously been admitted as an elector in any town in this state, whether single, married, widow or widower, and, *if the applicant is a married woman, her maiden name."* (Italics supplied.)

Section 9-33 provides: "Record of applicants. Change of name of married woman. The registrars shall keep in permanent form a record of all persons who apply for admission as electors at any session of the board for admission of electors, or to the town clerk or to either of the registrars under section 9-19b, showing the name, residence and place and date of birth of each such applicant. Such record shall be filed in the office of the town clerk. Any woman who has married subsequent to her admission as an elector may vote in the name appearing on the registry list prior to the date of such marriage upon satisfactory proof to the moderator as to her identity, and the registrars shall correct the registry list to conform to the provisions of this section."

The defendants make the same arguments for the interpretation of these sections as they did with respect to the sections discussed in subpart A of this memorandum, but they concede, as indeed they must, that these sections do not specifically state what name a married woman must use in applying for admission as an elector. While the defendants

testified that for their purposes they interpreted the sections as mandating the name change in their cities of Hartford and New London, at least since the attorney general so ruled on September 8, 1972, there was no evidence that this was a long-standing and uniform administrative interpretation throughout the 169 cities and towns of Connecticut. It therefore is not entitled to be treated as "cogent evidence" of legislative intent by the court. *Institute of Living* v. *Hartford,* 133 Conn. 258, 267.

The defendants cite *People ex rel. Rago* v. *Lipsky,* 327 Ill. App. 63 (1945), in support of their construction of the relevant election laws, and the similarity between that case and the present controversy is impressive. In *Rago* there was an election statute which required any voter who changed his or her name "by marriage or otherwise" to reregister in order to vote, and the court construed that statute as requiring all married women to reregister in their husband's surname. But the similarity between this controversy and two other recent cases is equally impressive. In *Stuart* v. *Board of Supervisors of Elections,* 266 Md. 440 (1972), and *State ex rel. Krupa* v. *Green,* 114 Ohio App. 497 (1961), the courts construed similar election laws requiring cancelation or reregistration after a change of name as applicable only to those women who in fact changed their names by custom upon marriage. Both of these courts refused to read into the election laws an implied statutory mandate that every woman must change to her husband's surname on the voting list after marriage.

This court is persuaded by the latter authority. As a question of statutory construction, this result is consistent with the social conditions of our times and not in derogation of the common-law principles discussed in part I of this memorandum. The court's

conclusion is also buttressed by the fact that its construction of the statute is in harmony with the constitutional requirements urged upon the court and discussed in part III herein. Such harmony is an appropriate consideration in the construction of a statute. *Adams* v. *Rubinow,* 157 Conn. 150, 153; *Blakeslee* v. *Water Commissioners,* 106 Conn. 642, 663.

The obligation of the respective registrars under § 9-33 to correct the registry lists to reflect a change of name for a woman upon marriage would be limited, therefore, to those women who, in fact, change their names when they marry.

## III

The plaintiffs argue that an interpretation of this state's election laws which would condition the right to vote of a married woman upon her acceptance of her husband's surname would constitute an invidious discrimination against women in violation of the "equal protection" provisions of the fourteenth amendment to the constitution of the United States. It is clear that under Connecticut law a person is generally free to adopt and use any name he sees fit[4] and that such a restriction on the use of a name would not apply to men. It would therefore appear that the interpretation of the election law contended for by the defendants would constitute a condition or limitation on the right to vote for women but not for men.

Whether such a classification based upon sex can pass constitutional muster under the equal protection cases is the issue here. In general, the Supreme Court decisions have been broken down into two separate approaches. In most instances, a classification will be upheld if it rests upon some rational basis not wholly irrelevant to the achievement of

---

[4] *Don* v. *Don,* 142 Conn. 309, 312.

some permissible state purpose. *McGowan* v. *Maryland,* 366 U.S. 420, 425. Where the classification rests, however, upon certain "suspect" criteria such as race, religion or national origin, or where it infringes upon certain "fundamental" rights, a strict scrutiny will be applied requiring that the classification be justified by some *"compelling* governmental interest." *Shapiro* v. *Thompson,* 394 U.S. 618, 634.

The question arises therefore whether sex is a "suspect" classification.[5] While a majority of the Supreme Court has not decided this issue, the court has moved perceptibly in several recent cases toward a more rigorous examination of any legitimate governmental interest in a classification based upon sex. Thus in *Reed* v. *Reed,* 404 U.S. 71, 76, the court invalidated an Idaho statute which gave mandatory preference to men over women where there was a dispute over the appointment of the fiduciary. In so holding, the court required that the classification bear a "fair and substantial" relation to the object of the legislation, a relation which the court found to be lacking in that case. Subsequently, in this past term, the court struck down federal statutes which provided, solely for administrative convenience, that female members of the military services had to prove factual dependency of their husbands in order to gain increased allowances, but male members did not, and for them such dependency was presumed. *Frontiero* v. *Richardson,* 411 U.S. 677. In *Frontiero,* the court held that classifications based upon sex are inherently suspect and must be subjected to strict judicial scrutiny. A concurring opinion deferred "a general categorizing of sex classifications as invoking the strictest test of

[5] The California Supreme Court has so decided in *Sail'er Inn, Inc.* v. *Kirby,* 5 Cal. 3d 1 (1971) ; see *United States ex rel. Robinson* v. *York,* 281 F. Sup. 8, 14 (D. Conn. 1968).

judicial scrutiny" largely because of a disinclination to preempt by judicial action a major political decision in the form of the pending equal rights amendment. Id., 692. On January 21, 1974, in *Cleveland Board of Education* v. *LaFleur,* 414 U.S. 632, the Supreme Court struck down, as in violation of due process of law, school board rules which in two states forced women teachers off their jobs in their fourth and fifth months of pregnancy, regardless of their individual ability to continue to work. The court again avoided holding that sex was a suspect classification in violation of equal protection of the law. While it appears likely that this will be the eventual result in these cases, it is unnecessary to decide that issue here, since the interpretation of the Connecticut election laws contended for by the defendants would not appear to meet the "fair and substantial" relationship test laid down by the court in the *Reed* case. This would seem to be particularly true where, as here, we are dealing with a voting rights case and the uncontradicted testimony of the defendants was to the effect that there would be no administrative inconvenience to them if married women were allowed the option to register in their maiden names, so long as the names were used consistently.

## IV

The defendants contend that mandamus is not an appropriate remedy to compel a course of action by public officials acting within the scope of their delegated authority, fairly and honestly exercised. *Hannifan* v. *Sachs,* 150 Conn. 162, 167. The defendants also argue that the plaintiffs have not established a clear legal right to register to vote in their maiden names and that mandamus should therefore not issue, since "it cannot and does not act on a doubtful and contested right." *State ex rel. Guglielmo* v. *Bergin,* 149 Conn. 631, 640.

In general, a writ of mandamus issues when the duty which is sought to be enforced is the performance of a definite act of a ministerial nature with respect to which the respondent has no discretion, when the right of the person applying for it is clear and when he is without other adequate remedy. *Cleary* v. *Zoning Board,* 153 Conn. 513, 518; *State ex rel. Lacerenza* v. *Osborn,* 133 Conn. 530, 534.

The obligation of registrars to register as a voter any applicant who possesses the statutory qualifications under his or her own legal name is most certainly a ministerial and not a discretionary one. There is nothing in the statutes authorizing the registrars to add to the statutory qualifications for voters or to use their discretion to refuse anyone who meets these qualifications. In an analogous situation, our Supreme Court has held that electors who met the statutory qualifications were entitled to be enrolled on a party enrolment list and could enforce that right by an action in the nature of mandamus. *In the Matter of Gilhuly's Petition,* 124 Conn. 271. In so holding, the court stated (p. 279): "Whether an elector shall be enrolled upon the party list rests no more within . . . [the official's] discretion than does the determination of whether a hunter's license shall be granted . . . [rest] in that of the town clerk to whom application is made. The statute prescribes certain definite prerequisites to the granting of the request in each case, and requires compliance upon the official's part when these exist."

Nor will the duty to the plaintiffs become a discretionary one because the parties differ on the merits of the issues involved. "The fact that a judicial interpretation may be necessary to enunciate the duty more specifically will not of itself

preclude coercion of the duty by a writ of mandamus." *State ex rel. Heimov* v. *Thomson,* 131 Conn. 8, 13.

The right of the plaintiffs to continue to use their maiden names as their legal and only true names was discussed and approved for the reasons earlier set forth in this opinion. Granting this conclusion, which the court has already reached, and there being nothing in the election laws to the contrary, the plaintiffs have established a clear legal right to compel the registrars to accept their applications for registration under their own (i.e. maiden) names. Nor do the plaintiffs have any other adequate remedy. A declaratory judgment, for example, would "involve circuity of action and delay, and fall short of affording the . . . [plaintiffs] a means of effectively, conveniently and directly enforcing the performance of the particular duty owing to . . . [them]." *State ex rel. Heimov* v. *Thomson,* supra, 14.

For all of the foregoing reasons it is the conclusion of the court that the plaintiffs are entitled to the relief prayed for in their complaint and a writ of mandamus may issue accordingly.