**In re Susan E. REBEN a/k/a
Susan E. Hirsch.**

Supreme Judicial Court of Maine.

July 18, 1975.

Howard T. Reben, Portland, for appellant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, ARCHIBALD, and DELAHANTY, JJ.

WEATHERBEE, Justice.

On July 19, 1973 the appellant, Susan E. Reben, filed a petition for change of name in the Probate Court of Cumberland Coun-

ty. A hearing was held on September 12, 1973 before the Judge of Probate. That Judge issued his decree on October 16, 1973 denying the relief sought in the petition.

The Petitioner appealed directly to this Court from the order.[1] Pursuant to 4 M. R.S.A. § 401, the Judge of Probate has reported to us the facts involved in this appeal. The full boundaries of the question before the Court are presented by these reported facts:

The Petitioner was born under the name Susan E. Hirsch. Upon marrying Howard T. Reben, now her attorney in this controversy, the Petitioner took the name of Susan E. Reben. Approximately six months prior to the hearing in Probate Court and several months after her assumption of the surname Reben, the Petitioner decided that she wished to change her last name back to her birth name. The Petitioner believes that a married woman should not be compelled to assume her husband's surname. Consequently, the Petitioner now uses her birth name for all purposes, "including", the Judge's report says, "two bank accounts, numerous credit cards, school registration, driver's license, social security, auto registration, home mortgage and voter registration". The Judge's reported factual statement concludes by noting that no fraudulent purpose was a factor in his denial of her request for a name change.

On appeal, the appellant first alleges that she has a right under the common law to choose any name she wishes, unless motivated by a fraudulent purpose, and that as the Judge of Probate found no fraudu-

lent purpose, his denial of her petition was an abuse of discretion. Second, she asserts that the Judge's ruling denies her equal protection of the laws by unconstitutionally discriminating against her as a woman.

We sustain her appeal. In doing so, however, we find it unnecessary to reach the constitutional question. See, e. g., State v. Good, Me., 308 A.2d 576 (1973).

There is a remarkable sparsity here of both decisional and statute law concerning the status of a married woman's name. This opinion, also, will leave many questions unanswered, foremost, probably, the question whether a woman takes the surname of her husband at marriage by operation of law. Traditionally this has been the almost unanimous practice in this state, yet no statute has required it and no decision of this Court has ever affirmed it as being mandated by the common law.[2]

We are satisfied as to the wisdom of the policy which dictates that we should, except in compelling situations, decide only issues which are necessary to the disposition of the case before us. We consider that it is particularly important that we exercise judicial restraint in an *ex parte* hearing such as this where we have had the benefit of only the Petitioner's arguments and where possible areas of wide personal and public concern are yet unexplored.

The ultimate question of whether the woman takes her husband's surname *by operation of law* is not necessary to this decision as this Petitioner agrees that she *did* take it (but as a result, she says, of her own choice to do so) and as her complaint is that the Judge declined to restore her

---

1. While the notice of appeal is directed to the Supreme Judicial Court, we treat the appeal as properly before the Law Court as required under 4 M.R.S.A. § 401.

2. Decisions in other jurisdictions are not in agreement as to this. For discussion of the opposing points of view on this question, see *People. ex rel. Rago v. Lipsky*, 327 Ill.App. 63, 63 N.E.2d 642 (1945) ; *Stuart v. Board of Supervisors of Elections*, 266 Md. 440,

295 A.2d 223 (1972) ; *State ex rel. Krupa v. Green*, 114 Ohio App. 497, 177 N.E.2d 616 (1961) ; Kanowitz, Women and the Law: The Unfinished Revolution (1969) ; 57 Am. Jur.2d Names § 9 (1971) ; 65 C.J.S. Names § 3c (1966) ; Kohout, The Right of Women to Use Their Maiden Names, 38 Albany L. Rev. 105 (1973) ; Lamber, A Married Woman's Surname: Is Custom Law? 1973 Wash.U.L.Q. 779 (1973).

maiden · name *judicially*. It seems to us that that ultimate question is primarily one of governmental policy which can best be determined by legislative action. If it must be decided by the Court, the decision should come as the law of a case, not as mere *dictum*, and preferably in an adversary proceeding where we will have the benefit of argument on both sides of the controversy.

To resolve the abuse of discretion issue now before us, we must examine and interpret for the first time the language of the name change statute under which the appellant's petition was filed.

The Maine Legislature enacted our first statute authorizing a judicial change of name—the predecessor of our present statute—in 1873. The original statute, P.L. 1873, ch. 97, read:

> "Sect. 1. Whenever any person in this state desires to change his or her name, such person may petition therefor to the judge of probate of the county in which he or she resides; and such judge of probate is hereby authorized and empowered to change the name of such person, and shall make and preserve a record thereof.
>
> Sect. 2. Whenever the judge of probate before granting any such petition, deems it expedient that notice thereof be given, such notice shall be given as the judge may order.
>
> . . . ."

This language has since evolved to become 19 M.R.S.A. § 781, upon which the present petition is based.

"If a person desires to have his name changed, he may petition the judge of probate in the county where he resides; or, if he is a minor, his legal custodian may petition in his behalf, and the judge, after due notice, *may* change the name of such person and *shall* make and preserve a record thereof." (Emphasis added.) [3]

The development of the custom of identifying individuals by names no doubt begins before the time of recorded history, but the factors which engendered a need for a recognizable symbol of identification can easily be understood. With the appearance of village society in Europe and the development of the laws of inheritance, real estate title and contracts, and the use of promissory commercial paper, some degree of reliance upon the names of persons became indispensable.

The New York Court of Appeals examined the ancient history of the use of surnames and the common law of England, which had grown largely from the prevailing customs, in *Smith v. United States Casualty Co.,* 197 N.Y. 420, 90 N.E. 947 (1910). The *Smith* Court concluded that at early common law a person could change his name nonjudicially, provided this was not done with fraudulent intent. Our own research has satisfied us that this was the state of the common law. *E. g., Linton v. First National Bank,* 10 F. 894 (W.D.Pa.1882); *Mark v. Kahn,* 333 Mass. 517, 131 N.E.2d 758 (1956); *In re Ross,* 8 Cal.2d 608, 67 P.2d 94 (1937).

It can easily be understood why the early, casual, common law practice of changing one's name at will would have resulted in

---

3. Language including minors appeared in P.L. 1876, ch. 59. The contraction of the phrase "his or her" to "his" was undertaken in 1893. (P.L.1893, ch. 262.) Such rephrasing, in view of our long standing rule of statutory construction (1 M.R.S.A. § 71(7); formerly R.S.1840, ch. 1, § 3(II)) that use of words of the masculine gender may include the female, did not alter the intended inclusion of females. The statute now also contains an additional sentence added by P.L. 1973, ch. 451 concerning a filing fee of $5.00.

Judicial changes of name are also authorized in connection with the granting of divorces (19 M.R.S.A. § 752) and adoptions (19 M.R.S.A. §§ 531–533).

Authority to grant changes of name is also included in the general powers given Judges of Probate by 4 M.R.S.A. § 251.

confusion and uncertainty as our American society moved steadily toward complexity and urbanization. The necessity of being able to ascertain an individual's correct name and identity must inevitably have appeared in business, real estate transactions, litigation, political activity, and law enforcement. The confident statement of the English Chief Justice, Lord Abbott, in *Luscombe v. Yates*, 5 Barn. & Ald. 544, (1822) that

> "[a] name assumed by the voluntary act of a young man at his outset into life, adopted by all who knew him and by which he is constantly called, becomes for all purposes that occur to my mind as much and effectually his name as if he had obtained an act of Parliament to confer it on him"

no longer provided a satisfactory answer to late 19th century North American society. The descendants of the young man of whom the late Chief Justice spoke could no longer be expected to live, buy and sell, litigate, beget, die and pass by inheritance in the community where they were born, where everyone knew them and called them by name.

We note that in the opinion from which we have quoted the English Chief Justice —as in many other opinions upholding the individual's right to use the name of his choice—the party had used and had been known exclusively by the adopted name for a period of many years. We find, in the older cases upholding the individual's common law right to change his name nonjudicially, such language as ". . . when his neighbors and the community have ac-

quiesced and recognized him by his new designation, that becomes his name" [4] and ". . . for many years transacting his business and holding himself out to his friends and acquaintances thereunder with their acquiescence and recognition. . . ." [5] It must have occurred to the Maine Legislature to wonder—as it does to us—how long the individual, especially the new arrival in town, would be required to use the new name before he and people dealing with him could feel assured that it had replaced his old one, had not been motivated by fraud, and had become his legal name—and to question the acceptability of such uncertainty as our social structure became more urban and more transient. [6] We have no doubt that the 1873 statute was intended to put these uncertainties to rest.

The Legislature's use of the language "his or her name" and "in which he or she resides" leaves no doubt that it intended to make the statutory procedure available to women as well as men but its intention to extend the privilege to *married* women is less clear.

At common law a married woman had no separate identity before the law. In the eyes of the old common law, a husband and wife became one person upon marriage and that person was the husband. *Mellott v. Sullivan Ford Sales*, Me., 236 A.2d 68, 70 (1967). Although the common law decisions frequently spoke of a "person's" right to change "his" name, our research has revealed no case where the exercise of this right at common law by a married woman was either affirmed or disapproved

---

4. *Laflin & Rand Powder Co. v. Steytler*, 146 Pa. 434, 442, 23 A. 215, 217 (1892).

5. *Smith v. United States Casualty Co.*, supra, 197 N.Y. at 423, 90 N.E. at 948.

6. In fact, it is evident that our very first Legislature considered the common law procedure less than satisfactory because one of its first acts was the enactment of Special Laws of 1820, ch. XVI which "allowed" seven men and women to "take" new names which

"shall hereafter be their only proper names." Succeeding legislatures received hundreds of requests for special legislation allowing them to take new "proper" or "proper and legal" names. The 1870 Legislature "allowed" 34 changes of name, in 1871 there were 30 allowed, in 1872 there were 29, and in 1873 there were 28. P. & S.L.1870, chs. 397, 403, 428; P. & S.L.1871, ch. 701; P. & S.L.1872, chs. 128, 165; P. & S.L.1873, chs. 239, 321, 389.

—a situation which might, of course, be explained by the absence of occasion for 18th and 19th century married women to exercise the right. In other words, it is unclear whether American married women (and especially Maine married women) did or did not have the right to change their names at common law.

The old common law concept of a married woman's loss of identity was gradually eroded by positive legislation early in our statehood. P.L.1821, ch. 57, § 9, empowered courts to authorize an *abandoned* married woman to contract and sue in her own name. P.L.1844, ch. 117, permitted married women to own and hold property not acquired from their husbands in their own names. P.L.1852, ch. 227, § 1 empowered them to dispose of such property. In 1866 the Legislature gave them the power to make valid and binding contracts and to enforce them (P.L.1866, ch. 52). Thus, by 1866 the married woman stood at least nearly equal before the law.

This Court has given strict construction to these statutes which granted extended rights to women in derogation of the common law, following long accepted principles of judicial construction. In *Haggett v. Hurley,* 91 Me. 542, 40 A. 561 (1898) the Court felt that it could not construe P.L. 1866, ch. 52 as authorizing a married woman to enter by contract into the status of a business partner of her husband. In *Cummings v. Everett,* 82 Me. 260, 19 A. 456 (1890) this Court held that although P.L. 1866, ch. 52 removed the disabilities of coverture, it was not clear that it was intended also to remove the disabilities of infancy so as to empower married female *minors* to contract.

Unsure as we are as to a married woman's common law right to name change, we apply the same strict rule of construction here, but the circumstances in the present case are substantially different from those in *Haggett* and *Cummings.* In *Haggett* and *Cummings* the Legislature had given *married* women a right not previously enjoyed by them and the Court felt it should not extend the right beyond the clear intent of the statute. Our present question is not the extent of the name-change right granted but to whom the 1873 Legislature intended to give it. The statute's words themselves are plain. The Legislature gave the privilege to "persons" —to both men and women. The married woman had by this time become a "person" in the full legal sense. While the concept of a single marital entity persisted as a fiction beyond 1866 to the extent that neither spouse could sue the other for tort (*Abbott v. Abbott,* 67 Me. 304 (1877)), it must have become clear to the Legislature that the husband was no longer that "one person". Nothing in the Legislature's language suggests that it intended to limit the privilege to *unmarried* women. In view of the earlier series of enactments which had, in a piecemeal manner, removed most, at least, of a married woman's disabilities, we cannot read into the 1873 statute an unexpressed intention to exclude *married* women from its operation. We believe that the situation as to a married woman's improved status was such that if the 1873 legislators had intended to exclude married women they would have said so.

The Petitioner has urged us that the statute with which we are concerned was not intended to be an exclusive method of name change but was only to augment the common law by providing an alternate method for those persons who wished a public record of their desire to adopt new names. In the posture in which this case is presented to us, we do not reach this contention directly. The Petitioner chose to petition the Judge of Probate under the statute. He denied her petition. The only question presented by this appeal is the correctness of his action *under the statute.* However, in our study to interpret the statute we find the question of the present survival of the common law right and the

question of the true status of the statutory authority to be inescapably interwoven.[7]

If, as the Petitioner contends, the Legislature had intended the statute only to provide a recording procedure, we would have expected the Legislature to have directed that the Judge *"shall* change the name of such person and shall preserve a record thereof."

Instead, the original statute said that the Judge of Probate is *"authorized* and *empowered"* to change the name and he *"shall* make and preserve a record thereof." (Emphasis added.) The present statute reads that the Judge *"may"* change the name and *"shall* make and preserve a record thereof." (Emphasis added.) The inference to be drawn from the choice of language of these Legislatures seems clear to us. The Legislatures mandated that a record must be kept if the name was changed but they intended the Judge to exercise a discretion as to whether the petition for change should be granted.

The statute contains no criteria for the exercise of such a discretion by the Judge. It would be unreasonable to assume that the 1873 Legislature intended to give the Judge a completely unbridled discretion to be exercised on whim or caprice. We consider that the Legislature may be presumed to have acted with knowledge of the existing state of the common law (*Blier v. Inhabitants of Town of Fort Kent*, Me., 273 A.2d 732 (1971); 73 Am.Jur.2d Statutes § 184 (1974)), as to changes of name, the inadequacies of which must have prompted the enactment of this legislation. We are convinced that the 1873 Legislature failed to include criteria for the judge's guidance because it was intended that the common law conditions (*i. e.*, lack of fraudulent intent) under which a person could change his name should constitute the standards for the exercise of the judges' discretion under the new statute. The Legislature's intent, we believe, was not to derogate the common law but to codify it.

We cannot accept the proposition that the Legislature, which fashioned a procedure for judicial change of name, with a permanent record, supplying the obvious deficiencies of the common law procedure, would intend the old procedure to survive and to function side by side with the one it had just created. It seems far more reasonable to conclude that the Legislature intended the statutory method to incorporate the essential philosophy of the earlier practice and to be a replacement of the common law procedure.

We note further that our original name change statute read:

"*Whenever* any person in this state desires to change his or her name . . . ." (Emphasis added.)

We find in the 1873 Legislature's choice of words even stronger evidence of intention of exclusivity of procedure than is found in the language which eventually evolved. This new judicial method, we believe, was to be—as the 1873 statute indicated—*the* way in which a name may be legally changed.[8]

We are aware that many other jurisdictions have held that their somewhat similar statutes were enacted only as aids to the

---

7. The Petitioner's argument points this up. She asserts that she has *already* effectively changed her name nonjudicially and now, judicially, seeks only a record of this fact. She then concedes that the Judge *does* have a discretion as to changing her name judicially (*i. e.*, as to the existence of fraudulent intent). If her position is correct, what would be her legal name if the Judge—for record purpose only, as she says—had found fraudulent intent and had refused to order it

changed? Or, if the Judge had ordered her name changed and she later decided to adopt still another name without resort to the Probate Court?

8. We note that the Legislature, indulging in the prerogative of the sovereign, continued occasionally to change a person's name by Private & Special Law. See P. & S.L.1889, ch. 330.

common law and were not intended to repeal the common law. *E. g., Clinton v. Morrow,* 220 Ark. 377, 247 S.W.2d 1015 (1952); *Weingand v. Lorre,* 231 Cal.App. 2d 289, 41 Cal.Rptr. 778 (1964); *Smith v. United States Casualty Co., supra;* Annot., 110 A.L.R. 219 (1937). Some distinction can be found in the fact that some of the statutes in these other jurisdictions impose conditions, unknown to the common law, upon the granting of a judicial change of name. The statute, which the Court in *In re Taminosian,* 97 Neb. 514, 150 N.W. 824 (1915) held to create only an additional method of name change, required a finding "that there exists proper and reasonable cause for changing the name of the petitioner." The New York Civil Rights Law, section 63, discussed in *Application of Douglas,* 60 Misc.2d 1057, 304 N.Y.S.2d 558 (Sup.Ct.1969), required that the court be satisfied "that there is no reasonable objection to the change of name proposed."

Certainly a valid argument can be made that these statutes set up complete, new procedures, whereas our own statute when enacted would have been incomplete and inoperative without the absorption from the common law of its standards for the exercise of judicial discretion.

The Massachusetts Court interpreted a statute which provided that

"[n]o change of the name of a person, except upon the adoption of a child under this chapter or upon the marriage or divorce of a woman, shall be lawful unless made by said court for a sufficient reason consistent with public interests." Petition of Merolevitz, 320 Mass. 448, 449, 70 N.E.2d 249, 250 (1946).

The *Merolevitz* Court recognized the acceptability of a person's use of an adopted name for social and business purposes but stated that the statutory procedure was "the only method by which one can change his name with legal effect." 320 Mass. at 450, 70 N.E.2d at 250. In Petition of Buyarsky, 322 Mass. 335, 77 N.E.2d 216 (1948)

that Court said that the statute was not intended to *restrict* a petitioner's choice of name and that the statutory limitation that it be "consistent with public interests" was intended to be a restatement of the common law principle that the petitioner's intent must not be fraudulent. The Massachusetts Court later, in *Mark v. Kahn,* 333 Mass. 517, 131 N.E.2d 758 (1956), held that the common law method of name change still survives and that the purpose of the statute was to provide a record.

While we have given respectful consideration to the holdings of the courts which take this view, we find little in their interpretations of their statutes which aids us as to our own.

■ It may be that some of the decisions which hold that the common law method of name change survives after statutory enactment were not distinguishing, as we do, between a person's *true* or *legal* name and the name by which he chooses to be known in social life and in business dealings. We recognize that a person may informally adopt a stage name, a *nom de plume,* or a business name or one for social purposes which is not his true name and, while using such a name, may obligate himself legally and, under certain conditions, enter into agreements which are binding upon other parties. *Lipman v. Thomas,* 143 Me. 270, 272, 61 A.2d 130, 131 (1948); *Huey v. Passarelli,* 267 Mass. 578, 166 N.E. 727 (1929). On the other hand, there are situations in which the public interest entitles the State to demand that a person identify himself by his true, legal name in connection with his performance of certain activities.

■ The nonjudicial name change permitted by the common law was always subject to a possible judicial determination that the attempted nonjudicial change had failed because it was motivated by fraud, that is, by a purpose to deceive. We are convinced that our own original statute was intended to bring the ancient principles

into consonance with modern needs by permitting the individual the same right but with a record, a definite date of change, and a determination *in advance* as to presence or absence of purpose to deceive. The common law method which would serve no further purpose was superseded.

■ We construe the *present* statute as necessarily including several implied standards in addition to that of absence of fraudulent intent. Subsequent to the original enactment a requirement of due notice was added by amendment. P.L.1893, ch. 262. We interpret this as a belated conclusion by the Legislature that the proposed name change should be denied if it is found that it would substantially interfere with the rights of others. In P.L.1876, ch. 59 the Legislature also added the provision permitting the legal custodians of a minor to petition in his behalf. While no specific standard was imposed for the guidance of Judges of Probate, they are necessarily implicit in the court's traditional concern for the welfare of the child involved and the sensibilities of those persons whose family responsibilities and rights may be affected. Finally, the Legislature cannot have expected the Judge of Probate to demean his office on request by ordering the adoption of a name of a scandalous or frivolous nature.

We hope that our Legislature, if it does attempt to clarify this sensitive and obscure area of the law, will choose to define further what rights may exist in persons other than a party seeking a new name—rights which must be respected by a Judge of Probate acting on a petition for change of name. Certainly this Court should refrain from endeavoring to amplify the Legislature's basic policy positions in non-adversary proceedings unless it is necessary to do so to reach a decision.

■ No further searching for unspecified legislative intent is necessary in this case. If one spouse has the right to object to the other's petition, Mr. Reben's appearance here as her attorney clearly demonstrates his nonopposition. We infer from the record that there are no children with possible adverse interests. If any other persons had rights which entitled them to object, they failed to do so, after public notice. The fundamental right of the Court not to be required to decree a name of a scandalous or frivolous nature is obviously not endangered. The Judge also found this Petitioner was not motivated by a fraudulent purpose.

The failure of the Judge to grant the petition was an abuse of discretion.[9]

The entry will be:

Appeal sustained.

Case remanded to the Probate Court for action consistent with this opinion.

WERNICK, J., did not sit.

POMEROY and ARCHIBALD, JJ., concurring.

DUFRESNE, C. J., dissenting.

DELAHANTY, J., concurring in dissent.

DUFRESNE, Chief Justice (dissenting).

On July 18, 1973 by petition addressed to the Judge of Probate in and for the County of Cumberland, Susan E. Reben (petitioner) asked that her married name of Susan E. Reben be changed to Susan E. Hirsch, her maiden name. She stated that she desired to use her maiden name as her

---

9. The harshness of this legal expression "abuse of discretion" is softened considerably by the fact that this is the first time that this century-old statute has been interpreted by this Court for the guidance of Judges of Probate.

legal name "for professional as well as personal reasons."

Her husband, who is a member of the bar, represented her in the Probate Court and prosecuted this appeal before the Law Court. At no time did he seek to be made an official party to the Probate Court proceedings through intervention or otherwise, although his submission to his wife's desires is obvious.

It is undisputed that the petitioner, following tradition, had used her married name of Susan E. Reben after her marriage to Mr. Reben. Some time thereafter, however, she reverted to her maiden name of Susan E. Hirsch and, at the time of hearing in the Probate Court, did claim that her bank accounts, credit cards, home mortgage, driver's license, auto registration, voter registration and social security had all been changed over to her former maiden name. Thus, her effort to establish an identity separate and distinct from that of her husband in accordance with her plan of action met with success up to the time she sought legalization of her name change before the Probate Court.

The Judge below denied her petition, stating in his decree, however, that "[t]here was no . . . finding that petitioner's request for a name change was motivated by a fraudulent purpose." From this adverse decree, the petitioner has appealed to this Court. I would deny the appeal.

The statute which governs probate court proceedings for change of name is 19 M.R.S.A. § 781:

> "If a person desires to have his name changed, he may petition the judge of probate in the county where he resides; or, if he is a minor, his legal custodian may petition in his behalf, and the judge, after due notice, may change the name of such person and shall make and preserve a record thereof."

The reference legislation, except for some contraction of language and the re-quirement of due notice, is the same as the original statute enacted by the Legislature in 1873. Public Laws 1873, c. 97, provided in pertinent part as follows:

> "Sect. 1. Whenever *any person* in this state desires to change *his* or *her* name, such person may petition therefor to the judge of probate of the county in which he or she resides; and such judge of probate is hereby authorized and empowered to change the name of such person, and shall make and preserve a record thereof." (Emphasis supplied).

That the 1873 Legislature, in the use of the term "person," meant to include the female as well as the male individual is clear beyond any possible doubt. The issue, however, presented to this Court is, whether by the use of the word "person" the Legislature intended to include a married woman while she was still legally married to her husband. In other words, did the Legislators of that era have in mind to set up the probate court as a forum wherein a married woman, while still married to her husband, could unilaterally exercise an unfettered right to shed her married surname to resume her former maiden name, her former married surname or such other name different from that of her husband's surname as she might elect to adopt?

There is no need to review the history of surnames at early common law. For historical value, one might read *Roberts v. Mosier,* 1913, 35 Okl. 691, 132 P. 678; *Smith v. United States Casualty Co.,* 1910, 197 N.Y. 420, 90 N.E. 947.

This Court has recognized an ancient common law right in individuals, partnerships and corporations, in the absence of statute, to adopt any name under which legitimate business transactions may be carried on, and contracts so entered into under an assumed name are valid and binding upon the contractual parties if unaffected by fraud. *Ex parte First National Bank,* 1880, 70 Me. 369, 380; *Bath Motor Mart v. Miller,* 1922, 122 Me. 29, 118 A. 715; *Lipman et al. v. Thomas,* 1948, 143

Me. 270, 61 A.2d 130. The Massachusetts Court in *Minot v. Curtis,* 7 Mass. 441, at 444, said: "We know not why corporations may not be known by several names, as well as individuals." See, *Melledge v. Boston Iron Company,* 1849, 5 Cush. (Mass.) 158, 176; *William Gilligan Co. v. Casey,* 1910, 205 Mass. 26, 91 N.E. 124.

Some authorities have concluded that, when one exercises the common law right to adopt another name by which one chooses to be known, absent a fraudulent or improper motive, then the adopted name becomes that person's legal name without any need to resort to formal legal proceedings, judicial or otherwise.

In *Petition of Buyarsky,* 1948, 322 Mass. 335, 77 N.E.2d 216, the Massachusetts Court stated:

"A man, if acting honestly, may assume any name he desires and by which he wishes to be known in the community in which he lives or in the trade circles in which he does his business. The law does not require a man to retain or to perpetuate the surname of his ancestors. The common law recognizes his freedom of choice to assume a name which he deems more appropriate and advantageous to him than his family name in his present circumstances, if the change is not motivated by fraudulent intent. The statute . . . does not restrict his choice but aids him to secure an official record which definitely and specifically establishes his change of name. We think that it is not only consistent with but also desirable in the public interests that the fact that one has commonly used a name for a number of years should be fixed and established by a public record showing that the name adopted has become his legal name. Any confusion that might have attended the use of a name honestly · assumed by one is dispelled by a record showing that that name is his legal name."

The petitioner contends that, under the common law of Maine, any person, including a married woman, has the absolute right, in the absence of fraudulent motives, to choose the name by which that person desires to be known and that, after the name has been adopted for a period of time, there results an automatic commutation whereby that person's family surname becomes lost and the adopted surname rises to the status of the only legal and true name of such person. I do not read our common law doctrine, as expounded by this Court, to have such a broad scope.

History seems to confirm that our common law, as it existed in Maine about 1820, did not attach such legal attributes to a change of name under the freedom-of-choice doctrine. It is a fact that, prior to the enactment of the change-of-name statute in 1873, the Legislature was recognized by the people of Maine as the only forum wherein a person could obtain an official change of his name. From the very first legislative session in 1820 through the subsequent sessions, hundreds of individuals resorted to the Legislature for their change of name. This general practice negates effectively the existence of any common law doctrine whereby a chosen new name, by reason of public acceptance for some reasonable time and in the absence of ulterior fraudulent motives in its adoption, would automatically become the sole legal and true name of the person for all purposes, especially to the extent of causing the family surname under which that person was previously known to be completely lost.

We note that women as well as men took advantage of the legislative process and obtained relief through special legislation, whenever they desired to change their name. Our research, however, has not disclosed a case where a married woman was allowed to change her surname while she was still married, except in cases where the family's surname of both husband and wife was being changed.

By the Private and Special Laws of 1836, chapter 171, among the name changes allowed, it was enacted—

"that John George Pushard of Dresden in the County of Lincoln together with his wife and children shall be allowed to take the surname of Shaw . . .— that Elisha Hayward of Sidney in the County of Kennebec, together with his wife and children shall be allowed to take the surname of Howard . . .— that Nathan H. Trickey of South Berwick in the County of York, with his wife Sarah, shall be allowed to take the surname of Milton—that Jefferson Holmes of Dearborn in the County of Kennebec with his wife Hannah shall be allowed to take the surname of Hossman . . . ."

The act further provided that
"said persons shall in future be respectively known and called by the name, which they are respectively allowed to take as aforesaid; *and the same shall be considered as their only proper name.*" [1]

(Emphasis added)

As stated in *Mellott v. Sullivan Ford Sales*, 1967, Me., 236 A.2d 68, at 70:

"In the eyes of the common law upon marriage a husband and wife became one person and that person was the husband. A married woman of any age was held incapable of entering into binding contractual relations and of acquiring or disposing of property. Upon marriage her husband took over all her personal property and the use of her real estate for his life and became responsible for her support, her debts and her torts."

In *Haggett v. Hurley*, 1898, 91 Me. 542, at 550, 40 A. 561, at 563, 41 L.R.A. 362,

this Court elaborated upon the common law unity concept of the husband and wife in this manner:

."There is a general consensus of opinion that the family existed before the state, and that autocratic family government was the first of all forms of government. It seems to have been regarded as an axiom by publicists for centuries that the family was the basis of the state, and that the destruction of the family would be the destruction of the state. To insure the unity and preservation of the family, there seemed to be thought necessary a complete identity of interests, and a single head with control and power. The husband was made that head, and given the power, and in return was made responsible for the maintenance and conduct of the wife. To prevent any clashing of interests between husband and wife, to prevent any divisions or separations in the family, the wife was disqualified during coverture from having any business interests, and from subjecting her personal estate to the claims of creditors. Such at least was the common law."

In view of the singleness of the family at common law and the husband's dominant role in the marriage relationship, it necessarily follows that, by common law principles and immemorial custom, a woman upon marriage assumed as a matter of law her husband's surname, with which she would use her own given name. Such is the general rule supported by the overwhelming weight of the authorities. *People v. Lipsky*, 1945, 327 Ill.App. 63, 63 N. E.2d 642; *Kelle v. Crab Orchard Rural Fire Protection District*, 1957, 164 Neb. 593, 83 N.W.2d 51; *Joyner v. McMurphy*, 1935, 26 Ala.App. 549, 163 So. 533; *Carl-*

---

I. Numerous similar changes of family surnames may be observed throughout the legislative history of the Maine Legislature at the initial stage of statehood. See, P. & S.Laws, 1838, c. 459; P. & S.Laws, 1839, c. 504; P. & S.Laws, 1840, c. 46; P. & S.Laws, 1841, c. 191; P. & S.Laws, 1843, c. 89; P. & S. Laws, 1844, c. 168; P. & S.Laws, 1850, c. 388; P. & S.Laws, 1852, c. 562; P. & S.Laws, 1854, c. 282; P. & S.Laws, 1856, c. 627; also, c. 648; P. & S.Laws, 1859, c. 274; also, c. 341; P. & S.Laws, 1860, c. 438; P. & S. Laws, 1863, c. 210; P & S.Laws, 1870, c. 428.

ton v. Phelan, 1930, 100 Fla. 1164, 131 So. 117; Bacon v. Boston Elevated Ry. Co., 1926, 256 Mass. 30, 152 N.E. 35, 47 A.L.R. 1100; Kidd v. Rasmus, 1955, Tex.Civ.App., 285 S.W.2d 415; Petition of Hauptly, 1974, Ind., 312 N.E.2d 857.

The New York Court in Chapman v. Phoenix National Bank of the City of New York, 1881, 85 N.Y. 437, described the common law view respecting the singleness of name in the marital relationship in the following crisp language:

> "For several centuries, by the common law among all English speaking people, a woman, upon her marriage, takes her husband's surname. That becomes her legal name, and she ceases to be known by her maiden name . . .. Her maiden surname is absolutely lost, and she ceases to be known thereby."

In 1820, when Maine became a state, the concept that, upon marriage, husband and wife were one person and that person was the husband and that the family surname, including that of the wife, was the husband's surname, was accepted tradition and became an integral part of the common law of the State. The early · settlers brought with them these conceptions of law, found them convenient and useful and put them into practice. To the extent that they gave them traditional recognition, these principles and rules of organized society prevalent at the time became part of their common law. They had the force of law. Common practice has always made common law. Whelton v. Daly, 1944, 93 N.H. 150, 37 A.2d 1. See also Conant v. Jordan, 1910, 107 Me. 227, 237, 77 A. 938, 31 L.R.A. (N.S.) 434.

> "It is the very essence of common or customary law that it consists of those principles and forms which grow out of the customs and habits of the people." In the matter of Pennock's Estate, 1853, 20 Pa. 268.

It is true that " 'the common law is not in its nature and character an absolutely fixed, inflexible system, like the statute law . . . .. It is rather a system of elementary principles and of general juridical truths, which are continually expanding with the progress of society, and adapting themselves to the gradual changes of trade and commerce, and the mechanic arts, and the exigencies and usages of the country.' " (Emphasis added). State v. Bradbury, 1939, 136 Me. 347, 9 A.2d 657.

In Bradbury, this Court acknowledged that the principles of the common law were readily applied by courts to give effect to the well recognized customs of the day and age. The flexibility of common law principles as the applicable law at any given time was fully reiterated in Moulton v. Moulton, 1973, Me., 309 A.2d 224, where this Court demonstrated its awareness

> "that the judicial branch of government has the prerogative, often enlarged into the responsibility, of responding to new conditions of the present free of the constraints of instrumentalities carrying over from the past and which prevent the efficient and equitable fulfillment of modern needs."

In Moulton, this Court reconsidered "the common law mystique that husband and wife are a single legal person" in the light of the positive legislative and judicial action which has practically equalized the status of the spouses and left the unity of marriage concept more theory than fact and lifted the common law bar against a married woman which prevented her, during marriage, to enforce against her husband a common law cause of action for tortious conduct toward her prior to the marital joinder. But the Moulton Court admitted the viability of the common law concept of a married woman's disability prior to the turn of the century (as evidenced by decisions such as Hobbs v. Hobbs, 1879, 70 Me. 381; Morrison v. Brown, 1891, 84 Me. 82, 24 A. 672; Perkins v. Blethen, 1911, 107 Me. 443, 78 A. 574), except for specific legislative liberation.

The immediate problem before this Court is not what the common law is in respect to the right of a married woman to change her surname, while married, to a name other than the surname of her husband, but rather whether the all-male Legislature of 1873,[2] by the use of the words "any person" in the change-of-name statute, intended to allow a married woman, during the existence of the marital status, to change her name from the surname of her husband to her former maiden name or such other name as she might desire to adopt.

In construing a statute, the public policy of the state and the effect thereon a particular construction may have are factors to be considered, together with the condition of existing law, whether statutory or common law, the object to be promoted by the legislation, the relief to be afforded, and any other facts throwing light on the purpose and intention of the Legislature. See *Blier v. Inhabitants of Town of Fort Kent*, Me.1971, 273 A.2d 732.

Legislative intent is the law and while the statute is the vehicle best calculated to express the intention of the Legislators, the court must look to the purpose for which the law was enacted and must avoid a construction leading to a result clearly not within the contemplation of the lawmaking body and contrary to well established long standing public policy of the State. The spirit, purpose and policy underlying a legislative enactment will prevail over the strict letter of the statute. See, *Craughwell v. Mousam River Trust Company*, 1915, 113 Me. 531, 95 A. 221; *Middleton's Case*, 1939, 136 Me. 108, 3 A. 2d 434; *S. D. Warren Co. v. Inhabitants of Town of Gorham*, 1942, 138 Me. 294, 25 A.2d 471; *Greaves v. Houlton Water Co.*, 1948, 143 Me. 207, 59 A.2d 217. The literal meaning of the language used in a statute must give way when its construction in accordance with the strict terms thereof would subvert the policy and intent of the Legislature. *Emple Knitting Mills, Aplt. v. City of Bangor*, 1959, 155 Me. 270, 153 A.2d 118.

The name-change statute was adopted to relieve the Legislature of a cumbersome process which could be better handled by general legislation providing a more desirable forum for decision and record keeping. It is unrealistic to believe that the Legislature of 1873, by the use of the general term "person," intended to change the lifestyle of women in the married status to the extent of destroying the family identity by sanctioning the proliferation of different surnames by the several members of a single family. It is obvious that the Legislators of that era would have looked upon such an innovative modification of the marital status as conducive to clashes of interest between husband and wife and fraught with potential danger to the family itself. They would not have sanctioned such an unorthodox and unconventional concept of the family unit without clear language to that effect.

This Court in 1898, in *Haggett v. Hurley, supra*, had to interpret the married women's liberation statute in the contract field. That statute provided that "the contracts of any married woman, made for any lawful purpose, shall be valid and binding, and may be enforced in the same manner as if she were sole." Notwithstanding the use of very broad and all inclusive language by the Legislature, the *Haggett* Court ruled that the common law disabilities of a married woman have not been so far removed by statute as to empower her to form a business partnership with her husband.

The *Haggett* Court further said:

"In enacting these statutes the legislature was aware that they could not be extended by implication, but would be construed strictly as in derogation of the

2. The first woman to occupy a seat in the Maine Legislature was Representative Dora Pinkham of Fort Kent. See roster of the Eighty-first Legislature (1923).

common law, and as modifying a long-approved policy. Such was the settled rule of construction in this state when the statute of 1866 was passed."

The Legislature of 1873 was cognizant of the continued applicability of the strict construction rule which was emphatically affirmed in *Hobbs v. Hobbs,* 1879, 70 Me. 381 and *Cummings v. Everett,* 1890, 82 Me. 260, 19 A. 456.

As stated in *Haggett, supra,* 91 Me. at page 547, 40 A. at page 562:

"No single statute should be interpreted solely by its own words. Upon enactment it becomes a part of, and is to be read in connection with, the whole body of the law. Its interpretation is to be in the light of the general policy of previous legislation and of the long-established principles of law and equity. There is a presumption that by the new enactment the legislature intended some progress along the line, and did not intend any reversal, of such established policy and principles. No new statute will be construed as intending such a reversal unless that intent unmistakably appears."

In *Cummings,* the Court applied the rule of strict construction to shield a minor married woman from liability on her executory contracts, even though the 1866 act provided that "the contracts of *any* married woman . . . shall be valid and binding, and may be enforced in the same manner as if she were sole." (Emphasis mine)

Although "[t]he common law doctrine of unity in marriage has been so eroded during the years by positive legislation that in modern times the status of the spouses has been practically equalized and the unity of marriage concept remains more theory than fact" (Roberts v. American Chain & Cable Co., Me., 1969, 259 A.2d 43, 48), nevertheless, public policy continues to endow the relationship arising upon the consummation of the marriage contract, as it always has, with enduring rights and responsibilities concerning which the State attaches primary importance and exercises ultimate control. *Dolan v. Dolan,* 1969, Me., 259 A.2d 32, 38. The marriage contract and the resulting family unit are the foundation upon which our organized society has been structured. *Whitehouse v. Whitehouse,* 1930, 129 Me. 24, 26, 149 A. 572.

In terms of State interest, the loss of identity of its members to the family unit, especially of the spouses themselves, would so neutralize familial and marital ties as practically to deny the very concept of the family. I cannot attribute to the Legislature of 1873, in its use of the term "person" in the change-of-name statute, such an almost revolutionary change in the lifestyle of married people. The State has a well defined interest in the continuance of the marriage relationship as that relationship has been maintained from the days of the common law to the present time on the grounds of public policy. Such radical change as contended for by the petitioner should be left to the explicit dictates of our Legislature.

In *Bedell v. Reagan,* 1963, 159 Me. 292, 192 A.2d 24, this Court did reassert:

" 'The legal unity of husband and wife and the preservation of domestic peace and felicity between them are desirable things to maintain where they do not produce injustice to the wife and where they do not inflict injustice upon outsiders and deprive them of their legal rights.' "

No injustice results to the wife who voluntarily contracts the marital status with the understanding that the family surname will be that of the husband. The common law doctrine becomes a part of the marriage contract. She is on the same footing as her prospective husband in that she may insist, as a premarital condition, that the family surname for her intended husband and herself be that of her choice. The husband has no greater right to change the

family surname than she has, since her disability is equally his. *Perkins v. Blethen,* 1911, 107 Me. 443, 447, 78 A. 574, 31 L.R. A., N.S., 1148. That there should be a single surname available to identify the spouses and children of a marriage is inherent in the very concept of the marriage partnership. The married woman's freedom of choice of surname, which results in the father and mother being known by different surnames, could well have a traumatic impact upon their children, be a source of conflict between the spouses in connection with their children's surnames and cause a great deal of confusion in their relationships with others in the community, let alone the administrative inconvenience that would be occasioned to the State in its record-keeping programs and the great potential for fraud in numerous situations.

Thus, the State has a significant and compelling interest in requiring the maintenance of a unitary family surname. The common law rule, that a wife takes her husband's surname upon marriage and cannot thereafter shed the same except upon the mutual decision of the spouses to change the family surname, bears a rational and substantial relation to the legitimate state interest in protecting the family unit, especially the children of the union, as well as to foster administrative convenience in many state regulatory fields.

The rule of the common law of Maine that a married woman upon marriage takes her husband's surname was fully recognized by the Legislature. Following the ratification of the Nineteenth Amendment to the Constitution of the United States relating to woman suffrage in 1920, our Legislature enacted the following legislation:

P.L.1921, c. 157

"Name under which women voters may register. Any married woman or widow may use her family name *as a part of the name* by which she shall be registered as a voter." (Emphasis additional)

P.L.1925, c. 145

"Sec. 1. Married women to be registered under given and married surname. Every married woman now registered, or who shall hereafter register as a voter, *shall be registered under her given and married surname.*

"Sec. 2. Registered women voters to notify registration board of change in surname. *Whenever an unmarried registered woman voter shall assume through marriage, or a married registered woman voter shall assume through any process of law a new surname,* she shall notify the registration board of said change, in person, and the board shall then re-register *in accordance with the preceding section.*" (Underscoring mine)

In the 1930 consolidation, these provisions appear as follows (R.S.1930, c. 6, s. 6):

"Every married woman now registered, or who shall hereafter register as a voter, shall be registered under her given and married surname. Any married woman or widow may use her family name as a part of the name by which she shall be registered as a voter. *Whenever a registered woman voter shall assume through marriage or any process of law a new surname,* she shall notify the registration board of said change, in person, and the board shall then register her again." (Emphasis supplied)

These provisions relating to the registration of women voters have remained the same to the present time, except that the part thereof which expressly **permitted** a married woman or widow to use her family name as a part of the name by which

she shall be registered as a voter was deleted in 1961. See P.L.1961, c. 360, section 10, subsection II and section 63; 21 M.R.S.A., section 102, subsection 2 and section 638.

It is obvious from this comprehensive voter registration law that, by requiring married women to register under their given and married surname, the Legislature was giving full force and effect to the traditional and well embedded common law of Maine that a woman's birth-given or otherwise acquired surname is changed by marriage and her husband's surname becomes as a matter of law her legal surname.

From that premise it follows that, absent specific authority to do so by legislative declaration, a married woman may not, during the existence of the marriage contract, adopt any other surname as her legal name, except with the concurrence of her husband in a judicial proceeding under 19 M.R.S.A., § 781 in which both seek a change of the family surname, or, if the Legislature would entertain their request, through special legislative action.

I am aware that the current trend of the authorities is to the effect that a married woman has the unfettered legal right to adopt any name other than her husband's surname either at the time of the marriage or at any time thereafter, provided her choice is made without fraudulent or improper motives. See, *State v. Green*, 1961, 114 Ohio App. 497, 177 N.E.2d 616; *Stuart v. Board of Supervisors of Elections*, 1972, 266 Md. 440, 295 A.2d 223; *Application of Halligan*, 1974, 46 A.D.2d 170, 361 N.Y.S.2d 458; *Petition of Hauptly*, 1974, Ind., 312 N.E.2d 857; *Custer v. Bonadies*, 1974, 30 Conn.Sup. 385, 318 A.2d 639; *Kruzel v. Podell*, 1975, 67 Wis.2d 138, 226 N.W.2d 458.

Whether in this era of the women's rights movement it still makes sense to require that a woman upon marriage must assume her husband's surname and that after marriage and while the marriage relationship endures she cannot unilaterally legally change her married surname, but may do so only in a joint proceeding to change the family surname, including that of the husband, wife and minor children, is a matter more properly resting in legislative discretion.

This historical marital structure calling for a common surname in marriage on the part of the members of the family unit, imbedded without dissent in the lifestyle of our Maine people from the beginning of our State to the present time and having received collateral legislative acceptance, is so fundamental and closely linked to the welfare of the State itself that for this Court to abrogate this common law doctrine which has endured in this State for over a century and a half would amount to judicial usurpation of legislative authority.

I do believe that the Legislature of 1873 never intended by the change-of-name statute to liberate the married woman from the then accepted strictures of the marriage contract which, when consummated, resulted in the wife's automatic acquisition of her husband's surname, nor did the Legislators of that era believe they were providing relief to married women which would allow them to change their married surname as contended for by the petitioner. "Courts will disregard the literal import of statutes to reach the true sense of the law." *Blier v. Inhabitants of Town of Fort Kent*, 1971, Me., 273 A.2d 732, 736.

The problem, if there be one, should be addressed to the legislative branch of government.

I would deny the appeal.